STATE *ex rel.* COLLINS, ATTORNEY-GENERAL, *v.* P. Z. JONES.

[64 South. 241.]

1. CONSTITUTIONAL LAW. *Amendment. Single amendment. Proceedings. Stare decisis. Statutes. Veto. Judges. Appointment. Determination of validity of amendments. Constitution, sections* 153, 273. *Laws* 1910, *chapter* 385.

The legislature of the state at the session of 1910 (Laws 1910, chapter 358) by joint resolution provided for the submission to the people for their ratification or rejection a constitutional

amendment as follows:   "Section 153.   The judges of the circuit
and chancery courts shall be elected by the people in a manner
and at a time to be provided by the legislature and the judges
shall hold their office for a term of four years."   Such submis-
sion being in accordance with long continued practice and con-
temporaneous construction by the legislative department of the
state of what constituted the proper method of submitting con-
stitutional amendments must be *held* to be in accordance with
section 273 of the state Constitution, which provides:   "That
when two-thirds of each house of the legislature shall deem any
amendment necessary, such amendment shall be read and passed
by each house."

2. CONSTITUTIONAL LAW. *Single amendment. Sections 5 and 6 of the
Constitution.*

Under sections 5 and 6 of the Constitution, which declares that all
political power is vested in and derived from the people, and
that the people of the state have the inherent, sole and exclusive
right to regulate the internal government, and to alter and abol-
ish their constitution, the amendment of section 153 of the Con-
stitution as provided for under the joint resolution of the legis-
lature of 1910 (Laws 1910, chapter 358) might be submitted to
the people as a whole, as such amendment contained but a single
proposition.

3. COURTS. *Proceedings. Stare decisis.*

While it is very important that the decisions of the supreme court
on constitutional questions should be uniform, harmonious and
consistent, and that an interpretation once deliberately put upon
a provision of such an instrument should not be departed from
without grave reasons, yet when the court has erroneously in-
terpreted that instrument and no harm can follow the correction
of such erroneous interpretation, it is the plain duty of the
court to do so.

4. STATUTES. *Veto. Section 153, Constitution.*

Section 153 of the Constitution as amended (Laws 1910, chapter
358) providing that judges of the circuit and chancery courts
shall be elected in a manner and at a time to be provided by the
legislature was never expected to be self executing or become
operative upon any other conditions than those named in the
amendment, it contemplates action by both houses of the legisla-
ture and the governor as in the passage of any other law and
hence an act providing for the election of judges, when vetoed
by the governor, is of no effect unless passed over his veto.

5. JUDGES. *Appointment. Constitution, sections* 153, 177, 165.

Under section 153 of the Constitution as amended making the judges of the circuit and chancery courts elective by the people, the governor was deprived of his power to fill vacancies by appointment during the recess of the senate, but where a vacancy occurred before a legislative scheme of election had been adopted, the governor might make an appointment under section 165 of the Constitution, providing that, in cases of emergency, provisional appointments may be made by the governor to fill a vacancy, which shall last until the vacancy is regularly filled in accordance with the law, enacted to put section 153 as amended into operation.

6. CONSTITUTIONAL LAW. *Validity of amendment.*

Where a *quo warranto* was brought to test the right of a chancellor to his office, who was appointed before the amendment of section 153 of the Constitution, which made the office elective instead of appointive by the governor, the supreme court will decide upon the validity of such amendment though the respondent was entitled to retain his office regardless of its validity, where it appeared that the real purpose of the suit was to test the validity of the amendment.

OPINION ON SUGGESTION OF ERROR.

1. CONSTITUTIONAL LAW. *Amendments. Adoption. Section* 273, *Constitution.*

Under section 273 of the Constitution providing that if more than one amendment shall be submitted at one time, they shall be so submitted that the people may vote for or against each amendment separately, it was not intended that single sentences of an amendment should be so subdivided as to submit the "single question" embodied in each sub-division.

2. STATUTES. *Constitutionality.*

Before a law is declared unconstitutional, the opposition between the law and the constitution should be such that the judges feel a clear and strong conviction of their incompatibility with each other.

APPEAL from the circuit court of Hinds county.
HON. W. A. HENRY, Judge.

*Quo warranto* by the state, on relation of Ross A. Collins, attorney-general, against P. Z. Jones. From a judgment for respondent, relator appeals.

The facts are fully stated in the opinion of the court.

*Ross A. Collins,* attorney-general, *Geo. H. Ethridge,* assistant attorney-general, *E. F. Noel, J. M. Vardaman, Neely Powers,* and *J. H. Howie,* for appellant.

The first and sixth grounds of demurrer are substantially the same, and allege that the amendment was a nullity because it contained more than one proposition and was not submitted in such manner and form that the people might vote for each amendment separately.

The first ground for demurrer is as follows: First, the petition praying for the issuance of *quo warranto* shows on its face that the state has no cause of action against the said defendant.

The sixth ground of demurrer is as follows:   Sixth, for further cause of demurrer defendant states that the so-called amended section 153 of the Constitution, relied upon by the state, is a nullity because it was never submitted to be voted upon in the manner required by section 273 of the Constitution.   Section 273 of the Constitution provides that whenever an attempt is made to amend the Constitution, that: "If more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for each amendment separately."

And the petition shows that this was not done, but the petition shows that the so-called amendment submitted two amendments at the same time and in the same amendment and not "in such manner and form that the people might vote for each amendment separately." The one amendment submitted the dual proposition as to whether or not circuit judges shall be elected, and as to whether or not chancery judges should be elected, thus changing from the present system of appointment, and submitting a dual proposition in a way that violated section 273 of the state Constitution.

We submit that section 153, as originally contained in the Constitution, constituted only one section and one subject-matter, and that was the mode of securing the

judges of the courts of original jurisdiction. This section before amendment read: "Judges of the circuit court and of the chancery courts shall be appointed by the governor." Not judges and chancellors shall be appointed by the governor.

They are all judges, and the only difference in them is the difference in their jurisdiction. The Constitution previous to amendment provided that judges be appointed. Now it provides that they be elected. Can it be said that the word, judges, must be split into parts before this section can be amended? This amendment merely changes section 153 to the extent of providing that judges of the circuit and chancery courts shall be elected by the people, in a manner and at a time to be provided by the legislature. Only one office, that of judges, is affected, and only one section and one feature of that section is touched, section 153, substituting an elective for an appointive provision, and authorizing the legislature itself to provide the time and manner of elections.

All that section 273 of the Constitution intended to guard against was the submission of different and unrelated subjects. The different subject-matters dealt with in one amendment need not be interdependent or indivisible, and is largely a matter of legislative discretion. The legislature is not compelled to submit separate amendments on propositions pertaining to a single purpose. 1 Story Const., 451; Black, Interpretation of Laws, 28; *State ex rel. Hudd* v. *Timm,* 54 Wis. 318; *State ex rel. Morris* v. *Mason,* 43 La. Ann. 590; *State ex rel. Adams* v. *Herriot,* 10 S. D. 110; Words and Phrases Judicially Defined, 368; *Edwards* v. *Lesuer,* 31 L. R. A. 815; *Green* v. *Waller,* 32 Miss. 677.

There would be but little trouble about this amendment were it not for the *dictum* in the case of *State* v. *Powell,* 77 Miss. 543. This case deals with "judicial amendments." It alters five sections of the Constitution and

touches on three other matters not affected by the present amendment. The *dictum* in this case is to the effect that more than one proposition was submitted to the people to be voted on and that the legislature had no right to submit to the people more than one proposition in the same amendment and that the said propositions should have been submitted to the people in separate amendments. On this proposition the court said, in 77 Miss. 571: "We are satisfied that the proposition submitted to the voters contained at least four separate amendments. The sections proposed to be repealed, to wit: 145, 149, 151, 152 and 153, relate to separate matters. Section 145 deals alone with the supreme court, as does said section 149. Section 153 deals with the judges of the circuit courts and of the chancery courts. Section 151 deals with the method of filling vacancies in the supreme court. Section 152 deals with circuit and chancery districts. It will thus be seen that the sections of the Constitution of 1890 sought to be repealed treat separately of the supreme court and supreme court judges, and of the judges of the circuit and chancery courts."

It is not necessary to the disposition of the case to determine whether the amendment was submitted in proper form.

It is said in the case of *People* v. *Sours,* 31 Colo. 369, 74 Pac. 167, 102 Am. St. Rep. 34, that after ratification by the people of the constitutional amendment, every reasonable presumption, both of law and fact, is to be indulged in favor of the validity of the amendment of its state Constitution, and it is also said that unless satisfied beyond reasonable doubt that the Constitution has been violated in the submission of the constitutional amendment, it must be upheld by the court. It is also said in this case that a constitutional amendment, embracing several subjects, all of which are germane to the general subject of the amendment, is valid and may be submitted to the people as a single proposition.

"The self imposed limitation on the power of the people to amend their fundamental law should not be so construed as to defeat the will of the people, plainly expressed, on account of a slight and unimportant failure to comply literally with such limitations if the requirements are substantially observed." *State ex rel. Thompson* v. *Winnett* (Nebr.), 10 L. R. A. (N. S.), p. 149, and note; 110 N. W. 1113.

To consider a proposition as two amendments, the proposition must relate to at least two distinct and separate purposes not dependent upon or connected with each other. *State ex rel. Hudd* v. *Timme,* 54 Wis. 318; *State* v. *Heriod,* 10 S. D. 109, 72 N. W. 93.

Provision of Constitution or laws may be repealed by implication as well as by express repeal. Prohibitory Amendment Cases, 24 Kan. 700.

As to adoption of amendments to the Constitution, if the spirit of the Constitution is obeyed, the form is immaterial and the amendment will be declared valid.

"When the voice of the people is constitutionally expressed in their favor, the amendments become and are a part of the fundamental law." Trustees University of N. C., 72 N. C. 76.

The action of the two houses and the will of the people, as expressed by their vote, should not be set aside or disregarded upon purely technical grounds, when no material requirement of the Constitution has been omitted, and where the proceedings taken clearly manifest the intention of those bodies and the people to amend the fundamental law, citing and approving *in re Senate,* File 31, 41 N. W. 981, 25 Neb. 864, and Prohibitory Amendment Cases, 24 Kan. 700. *Lovett* v. *Ferguson,* 10 S. D. 44; 71 N. W. 765.

We respectfully submit that the doctrine of these cases is sounder in principle than the doctrine in the Powell case, if such is held in that case.

The Constitution designed the ballot to be a practical instrument and realized that it might be possible for the

people to pass on several different sections of the Constitution pertaining to different matters, and where this is the case, instead of grouping all the propositions together and voting for them as a unit, it thought the best results could be obtained by having a separate vote as to each independent proposition, and this is the true limit to place on the legislature.

In *State* v. *Timme* (Wis.), 11 N. W. 785, the court said: ''We think amendments to the Constitution which the section required, shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view.'' See, also: *Mason* v. *State,* 43 La. Ann. 590, 9 So. 800; 24 Kan. 700; *Hays* v. *Hays,*. 47 Pac. 732; 5 Ida. 154; *Gabbott* v. *Chi., etc., R. R. Co.,* 171 Mo. 84, 70 S. W. 891.  See, also, authorities collected in 10 Century Digest, title, ''Constitutional Law,'' section 2.

Did the legislature fix a time and manner for the election of judges of the circuit and of the chancery courts, and did the legislature act in accordance with the constitutional amendment, and did the governor have the right to attempt to nullify the legislature's action?

It was clearly the intention of the legislature to provide a scheme that would be in nowise dependent upon the sanction or consent of the governor.  It is well settled that the proposing of constitutional amendments, and providing for changes in the organic law is not legislation in the ordinary acceptation of that term.  It has been numerously held by the authorities that a resolution proposing an amendment to the Constitution does not have to be submitted to the chief executive for his approval or veto, and the Constitution itself, in section 273, recognized this by entrusting the duty of proposing amendments to the legislative department of the government and not to the executive or judicial departments.

The Constitution of the United States, article 1, section 7, requires every order, resolution, bill, or vote re-

quiring the concurring of both houses to be presented to the President for his approval or veto before it becomes effective. If he approves it, he signs it, and if he disapproves it he vetoes it, and returns it to the house from which it originated with his objections to the measure.

It was especially held in the Federal courts that an amendment to the Constitution did not have to be submitted to the President for approval or disapproval; that this was not legislation within the contemplation of the above section of the Federal Constitution, but was a proceeding under a different section providing for the amendment of that instrument. *Hollingsworth* v. *Virginia*, 3 U. S. (3 Dallas), 378; 1 Law Ed. 644.

That a constitutional amendment is distinguishable from ordinary legislation and that it does not have to be submitted to the governor for his action is settled by many authorities. See: 41 N. W. 981; *City of Chicago* v. *Reeves*, 220 Ill. 274, 77 N. E. 237; *Julius* v. *Callahan*, 65 N. W. 267, 63 Minn. 164; *State* v. *Mason*, 43 La. Ann. 590, 9 So. 776; Approves 24 Kan. 700; *In re Senate File No. 31*, 25 Neb. 864, 41 N. W. 981; *State* v. *McBride*, 4 Mo. 303, 29 Am. Dec. 636; *Kephler & Lange* v. *Hill*, 60 Iowa, 543, 14 N. W. 738; *Commonwealth* v. *Greist*, 195 Pa. St. 396, 46 Atl. 505, 50 L. R. A. 568; *Hays* v. *Hays*, 5 Idaho, 154, 47 Pac. 732; *State ex rel. Wineman* v. *Dahl* (N. D.), 34 L. R. A. 97; *State* v. *Bailey*, 16 Ind. 46; *May* v. *Rice, Auditor*, 91 Ind. 546; *Nesbit* v. *People*, 19 Colo. 441, 5, 7, 54, 36 Pac. 221.

It is urged that the governor simply filled a vacancy which he had a right to do under section 177 of the Constitution, and, further, that section 177 is in nowise affected by the amendment as passed by the legislature.

It is insisted in the demurrer, and will be pressed, we assume, in argument, that the present judge of the chancery court is holding under an appointment to fill a vacancy occurring during a recess of the senate and that section 177 has not been repealed. We respectfully sub-

mit that the power given the legislature under the amendment in question naturally and necessarily involves section 177. Under familiar rules of construction, where the Constitution confers a power upon the legislature and the legislature has acted under such power, in a valid manner, the act of the legislature becomes as effective as if it was actually written in the Constitution itself. *Ex parte Fritz,* 86 Miss. 210, 32 So. 722; 8 Cyc. 749, par. (c); *People* v. *Angle,* 109 N. Y. 564, 17 N. E. 413; 16 N. Y. St. 647; *Popfinger* v. *Yutte,* 102 N. Y. 38, 6 N. E. 259; *State University* v. *McIver,* 72 N. C. 76; *Wood* v. *Fitzgerald,* 3 Ore. 568; *Bray* v. *Florence,* 62 S. C. 57, 39 S. E. 810; *Fuller* v. *McFarland,* 6 Heisk. (Tenn.), 79; *Cox* v. *State,* 8 Tex. App. 254, 34 Am. Rep. 746; see 10 Cent. Dig., tit. "Constitutional Law," par. 21; *State* v. *Chappell,* 74 Mo. 335; *Ex parte Snyder,* 64 Mo. 58; *State* v. *Holcomb,* 46 Neb. 612, 65 N. W. 873; *People* v. *Gautier,* 2 Wheel. Crim. (N. Y.) 77; *Frasier* v. *Alexander,* 75 Cal. 147, 16 Pac. 757; *McTigue* v. *Com.,* 99 Ky. 66, 35 S. W. 121; *U. P. R. R. Co.* v. *Saunders Co.,* 7 Neb. 228; *Smith* v. *Thursby,* 28 Md. 244; *People* v. *Rice,* 135 N. Y. 473, 31 N. E. 921; 47 Am. St. Rep. 702, 16 L. R. A. 836 (reversing 19 N. Y. Supp. 978, 47 N. Y. St. 685); *Quick* v. *White Water Tp.,* 7 Ind. 570; *Chance* v. *Marion County,* 64 Ill. 66.

*L. Brame,* for appellee.

Regardless of all other questions, it is. respectfully submitted that the proposed amendment in question in this case never became a part of the Constitution because it was never passed by the legislature. In the *Powell case,* 77 Miss. 542, strangely reported as "Judiciary Amendments," the rule of strict construction as to amending the Constitution was recognized and applied, and properly so. Referring to the requirements of the Constitution in this regard, the court used this language: "When it prescribes the exact method in which an

amendment shall be submitted, and defines positively the majority necessary to its adoption, these are constitutional directions mandatory upon all departments of the government and without strict compliance with which no amendment can be validly adopted.'' The many authorities cited in the opinion show this to be the established doctrine.

Having in view this rule of strict construction, let us examine the Constituton and the concurrent resolution of the legislature of 1910 proposing the amendment to the organic law, section 273 of the Constitution provides as follows: ''Whenever two-thirds of each house of the legislature shall deem any change, alteration, or amendment necessary to this Constitution, such proposed change, alteration, or amendment, shall be read and passed by a two-thirds vote of each house respectively, on each day, cf three several days; public notice shall then be given by the secretary of state, at least three months preceding an election, at which the qualified electors shall vote directly for or against such change, alteration, or amendment.''

From this it will be seen that two fundamental things are required: (1) That the proposed amendment shall be read and ''passed'' by a two-thirds vote of each branch of the legislature. (2) That the secretary of state shall then give notice three months preceding an election at which the electors may vote for or against the same. In other words, before the Constitution can be amended two-thirds of each house of the legislature must expressly and affirmatively go on record as favoring the amendment. It must be passed by the legislature and in this way. Then, and only then, it is to be referred to the people. Under this carefully guarded provision there is no more authority for changing the organic law on a mere vote of the people after notice given by the secretary of state, than there would be for the legislature to change it without a vote of the people. There must be

express affirmative action on the part of the legislature in favor of the amendment, the measure itself, before the question can ever be submitted to the electors.  If less than two-thirds of each house shall not vote for it on three several days, or if the members of the legislature should be inclined to dodge the issue and avoid responsibility of referring the matter to the people, the amendment must necessarily fail.  This necessarily results from the very language of the Constitution.  If a change in the organic law is desired and a two-thirds vote of each house of the legislature cannot be secured to pass the amendment, the only remedy is to elect men to the legislature who will favor it.  There is no other remedy except by a constitutional convention or by revolution.

The concurrent resolution of the legislature of 1910 is as follows:  "Resolved, by the legislature of the state of Mississippi, two-thirds of each house concurring therein, that the following amendment to the state Constitution be submitted to the qualified electors of the state for ratification, or rejection, at an election to be held on the first Tuesday after the first Monday in November, 1910, viz.:"

See Laws 1910, p. 306.  From this it will be seen that the proposed amendment was not passed or even considered by either branch of the legislature.  For aught that appears, every member of the legislature was opposed to the change.  To illustrate our position, suppose the resolution had recited that those voting for its adoption did not favor the change; or, to make the illustration stronger, suppose it had been recited that the members were opposed to the measure, but nevertheless a sufficient number had voted for the resolution to get rid of the matter or to satisfy a popular clamor by merely referring it to the people, would it be contended before any court that the Constitution of the state had been changed?  It may be said that the case or cases here supposed are extreme.  That is true, but they illustrate the principle

involved and are entirely appropriate to show the wisdom and necessity of following strictly the plain terms of the fundamental law in respect to a matter so vitally important as making a radical change in the selection of the judiciary.

No, no, this will not do. In the language of the great Mr. Webster we cannot presume to be wiser than the law. Nor can we forget the wisdom and care of the great men who framed our present Constitution and hedged it about with limitations and qualifications intended to safeguard the lives and liberties of the people. We cannot presume that they embraced in the Constitution any provision or requirement that it so be treated as surplusage. While safe-guarding the interest of the people, they knew that the populace had to be protected against itself. Knowing that certain Barabas had on an eventful occasion been chosen to live by an excited populace, they were well aware that in times of political excitement or under some stress of circumstances a majority of the electors might act rashly in the matter of amending the organic law, they wisely provided the safeguards contained in section 273, among them being the requirement that any proposed change or alteration in the Constitution must be voted for by a two-thirds majority of each house of the legislature and on three different days before it could be submitted to the people for a vote. Not merely that the legislature, without approving or disapproving the matter, should merely refer it to the people for their action. The framers of the Constitution did not believe it wise, without any legislative endorsement, to refer to a popular vote the right to dispense with the trial by jury, the writ of *habeas corpus* and the like. The rights guaranteed by the Constitution many of them had cost too much of blood and treasure, to be voted away thoughtlessly by a bare majority after an excited political campaign. Therefore it was wisely provided that a two-thirds vote of the legislature and a

majority vote of the qualified electors should co-operate in bringing about any change, that the secretary of state should give the notice and that a valid election by the people would not be had on any amendment until it had been previously and with great formality passed by a two-thirds majority of both branches of the legislature.

It will not do to say that the legislature by referring the matter to the people for a vote by implication gave their approval to the measure, for that does not meet the express requirement that the amendment is to be passed by the legislature, and besides constitutions are never changed or amended by implication. Nor can it be said that the reference to the popular vote is the only important thing to be considered. That is of course important but not all important. Otherwise, why the extreme formality of voting on three several days and requiring a two-thirds majority of each house? If the popular vote is the only substantial and important thing to be considered why not provide by ordinary resolution for submitting the matter? The answers to these inquiries, we see and the express language of the Constitution all go to show what seems to be perfectly plain that the amendment must be voted on and approved by both the legislature and the people, and in the formal method provided for, before it becomes a part of the Constitution.

It is to be noted that the Constitution does not require that the legislature shall direct that notice be given and that the matter be voted on by the qualified electors. All that the legislature has to do is to pass the resolution of amendment, then follows automatically the action of the secretary of state in giving notice and the holding of the election.

*Mayes & Mayes, Powell & Thompson* and *Luther L. Tyler,* for appellee.

Our contention is that the proposed amendment violated that section of the Constitution which provides that

when, "More than one amendment shall be submitted at one time they shall be submitted in such manner and form that the people may vote for or against each amendment separately."

It is our contention that when the legislature submitted the amendment which provided that "The judges of the circuit court and chancery courts shall be elected by the people in the manner and at the time to be provided by the legislature, and the judges shall hold their offices for a term of four years." This amendment violated the above section of the Constitution, because it submitted two propositions to the people to be voted upon.

The point we make is this: That the only point of unity between the judges of the circuit court and of the chancery court is the mere fact that they are called judges; but in every other feature these two courts are distinct and separate, and dealt with as distinct subject-matter. It cannot be said to be one and the same subject, when the tribunals named have separated, and distinct, and different jurisdictions, having in common only the name of judge.

We say that it seems clear to us, even without the Powell case, that section 273 is violated when it submits to the people two distinct tribunals, to be voted upon, as to whether or not the mode of the selection of tribunals will be changed. This has been, in our judgment, expressly decided by the case of the *State* v. *Powell. Crawford* v. *Gilchrist,* 59 So. 963; *McBee* v. *Brady,* 100 Pac. 97; *State* v. *Timme,* 64 Wis. 318, 11 N. W. 785; *In re Senate File No. 31,* 25 Neb. 864, 41 N. W. 981; *State* v. *Heriod,* 10 S. D. 109, 72 N. W. 93; *Gabbert* v. *Ry. Co.,* 171 Mo. 84, 70 S. W. 891; *State* v. *Powell,* 77 Miss. 543.

The amendment does not affect judges appointed before it becomes effective. The amendment submitted was an amendment only to change the mode of selecting the judges. It was proposed to make the judges elective instead of appointive, and that was the only change

that the amendment proposed.    Under the appointive system, they hold for a term of four years; and under the elective system, it was proposed to continue this term for four years.    Now, our contention is that since the amendment deals only with the change in the mode of selection, it does not affect the term of any judge in office at the time it becomes effective.    8 Cyc. 764; *State v. Scott,* 9 Ark. 270.

In Cooley on Constitutional Limitation, page 97, it is said that a Constitution could operate prospectively only, unless the words employed show a clear intention that it should have a retrospective effect.

The amendment in question clearly shows that it was intended only to operate prospectively.    *Mestas* v. *Diamond Coal & Coke Co.,* 76 Pac. 567.

In 8 Cyc. 719, it is said: "A Constitution can be amended or changed only in the mode therein described."

In the case of *Collier* v. *Frierson,* 24 Ala. 109, it is said:   "We entertain no doubt that to change the Constitution in any other mode than by convention for requisition, which is demanded by the instrument itself, must be observed, and the omission of any one is fatal to the amendment.    We clearly deem any argument unnecessary to enforce this proposition.    The Constitution is the perfect and paramount law.    The mode by which amendments are to be made in it is clearly defined.    It has been said that certain acts are to be done, certain requisitions are to be observed, before a change can be effected.    But to what purpose are these acts required, or these requisitions enjoined, if the legislature, or any other department of government, could dispense with them?    To do so would be to violate the instrument which they are sworn to support, and every principal of public law, and sound constitutional policy requires that the courts pronounce against every amendment which is shown not to have been made in accordance with the rules prescribed by the fundamental law."    *Scruggs et al.* v. *Huntsville,* 45 Ala. 221.

It is our judgment that section 273 of the Constitution was violated when this amendment was submitted; that the amendment contained more than one subject, and in the name of the 125,000 qualified electors of this state who have not expressed themselves upon this subject, and a million and a half citizens, we insist that before this organic law is changed, that the mode prescribed by them and consented to by all the people of this state should prevail. *State* v. *Winnett,* 10 L. R. A. (N. S.), 149. Amended section 153 provides for the election at a time to be provided by the legislature, etc.

At the session of 1912, after this alleged amendment was inserted in the Constitution by a resolution of the legislature, the legislature undertook to pass an act providing for the election of the judges in November, 1912. This act was vetoed by the governor and was not passed over his veto. It is the contention of the attorney-general, that the governor had no right to veto this act. Our contention is that the amended section of the Constitution is not self-operative; that by its terms it provides that it shall not become effective, even after its adoption and insertion in the Constitution, except at a time and manner to be provided by the legislature. Our contention is that even if it should be conceded that the amended section, if valid, could have provided a self-operative method, it did not do so, and the section itself withholds operation, even after insertion, until the legislature shall provide some method of an election and a time for same. The question in this case is not what might have been put in as a part of the power in the amended section, but what was.

It is contended by the attorney-general that because the amended section says that the judges of the court shall be elected by the people "in a manner to be provided by the legislature," that this was exclusive of the power of the governor to have any control over this matter. We deny this. If the court will turn to various

sections of the Constitution, it will see that the use of the words "as provided by the legislature" and "as the legislature may provide by law" are used indifferently and mean the same thing.

In the first place, if the court will turn to section 60 of the Constitution, it will find that this instrument provides that, "No law shall be passed except by bill."

By section 60 of the Constitution the legislature can exercise no power conferred on them save by bill. It is prohibited from acting in any other way. Therefore, when the amended section provided that the judges should be elected in a manner to be provided by the legislature, this section was voted in full view of section 60 which prohibits the legislature from making any provision about anything except by regular bill.

This section also provides that the resolution of both houses, affecting the prerogative and duties of same, relating to adjournment, to amendments to the Constitution, etc., shall not require the signature of the governor. The attempted law putting into force this amendment was not any resolution affecting an amendment; all the resolution which could be passed affecting this amendment was passed when it was inserted in the Constitution. The remaining thing to be done, conceding its validity, was to pass a law putting it into effect, and this could not be done except by bill.

When we consider section 72 of the Constitution we do not think it is necessary to show that the governor did have the power to veto this bill. If it was the duty of the legislature to pass it before this amendment could be put into effect, it was within the power of the governor to veto this bill as much so as any other bill which might be passed.

There is nothing in the amendment which gives to the legislature exclusive of the power of the governor, the right to pass a law putting this into effect; and an examination of the Constitution will show that the words "to

be provided by the legislature'' and ''as the legislature shall provide by law'' are used indifferently in the Constitution. Thus in section 103 of the Constitution it is said: ''The legislature shall provide suitable compensation for all officers, and shall define their respective powers.''

In section 105 it is said: ''The legislature shall provide for the enumeration of the inhabitants, etc.''

In section 112 it is said: ''The legislature may impose a *per capita* tax upon domestic animals, etc.''

In section 152 it is said: ''The legislature shall divide the state into convenient court districts, etc.''

In section 172 it is said: ''The legislature shall establish inferior courts.''

In section 178 it is said: ''The legislature shall have the power to alter, amend and repeal charters.''

In section 182 it is said: ''The legislature shall have the power to grant exemptions from taxation, etc.''

On the other hand, in section 78 it is said that it shall be the duty of the legislature to regulate by law the cases in which deductions from salaries shall be made, etc.

In section 79 it is said: ''The legislature shall provide by law for the sale of delinquent taxes.''

In section 17 it is said: ''Private property shall not be taken except as provided by law.''

In section 10 it is said: ''The legislature may provide by general law for condemnation proceedigns, etc.''

In section 103 it is said: ''The legislature shall provide by law for the due certification of causes, etc.''

We see that the Constitution uses these words indifferently, and that in every case, whether the language of the Constitution is that ''the legislature' shall provide,'' or that ''the legislature shall provide by law,'' there has never been, and never will be, any attempt on the part of the legislature to carry out any of the powers conferred on them by the Constitution, except in the orderly way of passing a bill.

As to the present appointee.  As to the chancellor now
serving, whatever may be the decision of the court, his
term of office cannot be affected by the court's holding.
At the time he was appointed there was a recess in the
senate and a vacancy by resignation.  A resolution of
the legislature does not have to be approved by the gov-
ernor.

Counsel for the state devote much time to the propo-
sition that a resolution does not have to be signed by
the governor.  We do not take issue with him on this
proposition.  Indeed, we could not, in view of section 60
of the Constitution which provides in what cases resolu-
tions shall be passed, and what is the effect of those res-
olutions.

Our contention is that if it be conceded that this sec-
tion of the Constitution was properly adopted, that when
by resolution it was inserted in the Constitution, that
was the only resolution the legislature could pass con-
cerning it.  Its enforcement could only be done by a
bill.

In conclusion we desire to say that we have not under-
taken to answer the various citations of authority which
are found in the brief of the attorney-general.  We have
not deemed it necessary.  We simply call the court's at-
tention to the fact that in the case of *Powell* v. *State,*
in 77 Miss., will be found nearly every authority cited in
the first half of the attorney-general's brief, and, the
court has so thoroughly discussed these authorities in
that case that we felt that any further discussion by us
would be an attempt to paint the lily.  The opinion
sorted out and distinguished and discussed them.

In the second half of the attorney-general's brief, cases
not found in the case of *State* v. *Powell,* will be found
in note 40, 8 Cyc. 749, and 10 Century Digest, under title
"Unconstitutional Law."  We think these two citations
cover every authority cited by the learned attorney-gen-
eral, except those which may be said to deal with the

question of whether or not the governor is required to approve a resolution. We take it that under the language of our Constitution, the cases in which resolutions may be passed by both houses; the effect of those resolutions; the fact that the governor shall not be required to sign them, is so well fixed that we can do nothing more than cite the Constitution itself.

SEXTON, Special Judge, delivered the opinion of the court.

The facts of this case, briefly stated are: The legislature of the state at the session of 1910 (Laws 1910, ch. 358) by joint resolution provided for the submission to the people for their ratification or rejection a constitutional amendment, which is as follows: "Section 153. The judges of the circuit and chancery courts shall be elected by the people in a manner and at a time to be provided by the legislature and the judges shall hold their office for a term of four years." The amendment was adopted by the people and inserted into the Constitution of the state by the legislature of 1912. At the same session of the legislature, a bill was passed, known as Senate Bill No. 322, providing for the election of the judges named in the constitutional amendment, and this bill was vetoed by the governor of the state. Subsequent to this action on the part of the legislature, that is to say, on January 18, 1913, Hon. P. Z. Jones of Brookhaven, Miss., was appointed chancellor by the governor for a term of four years beginning February 1, 1913; and this appointment was subsequently confirmed by the senate of 1913, and said Jones qualified as chancellor of the district.

In this attitude of affairs, the attorney-general of the state filed a *quo warranto* proceeding to test the right of Jones to hold said office. The contention of the attorney-general is that the constitutional amendment providing for the election of judges took from the governor

the power to make the appointment of a chancellor, and that the appointment was a nullity.

The defendant filed a demurrer to the petition filed by the attorney-general, in which several causes of demurrer were assigned. The real contest, however, arises out of the question raised by the sixth cause of demurrer, which is as follows: "Sixth. For further cause of demurrer defendant states that the so-called amended section 153 of the Constitution, relied upon by the state, is a nullity, because it was never submitted to be voted upon in the manner required by section 273 of the Constitution. Section 273 of the Constitution provides that whenever an attempt is made to amend the Constitution, that 'if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for each amendment separately,' and the petition shows that this was not done, but the petition shows that the so-called amendment submitted two amendments at the same time and in the same amendment, and not 'in such manner and form that the people might vote for each amendment separately.' The one amendment submitted the dual proposition as to whether or not circuit judges should be elected, and as to whether or not chancery judges should be elected, thus changing from the present system of appointment, and submitting this dual proposition in a way that violated section 273 of the state Constitution."

Quite a number of the states, twenty-nine in number, have constitutional provisions substantially the same as section 273 of our Constitution, and the question of whether certain amendments which have been proposed from time to time thereto constituted more than one amendment and should have been separately submitted has resulted in litigation in several of the states. A review of some of these decisions will be helpful in determining exactly what the limitation contained in section 273 of our Constitution in reference to the submission of amendments was intended to embrace.

It is first earnestly insisted by one of the attorneys for appellee, who filed a separate brief, that, regardless of every other question in the case, "the proposed amendment in question in this case never became a part of the Constitution, because it was never passed upon by the legislature." We think the amendment was properly passsed by the legislature, as the petition alleges, and as the demurrer to the petition seems to admit, but, regardless of this, the method adopted by the legislature in the instant case was in strict conformity with the plan adopted for the submission of constitutional amendments both before and after the incorporation of section 273 in the Constitution of the state, as will be seen by reference to the following acts of the legislature, where submissions of amendments have been proposed and acted upon, viz.: 1854, p. 173; 1872, p. 163; 1876, pp. 30, 127; 1878, p. 203; 1900, p. 239; 1904, p. 223; and 1908, p. 259. In view of this long-continued contemporaneous construction by the legislative department of the state of what constituted the proper method of submitting constitutional amendments, and the fact that the framers of the Constitution must have been familiar with this method of submitting proposed amendments, we do not think that this contention is sound.

In the case of *State ex rel. Hudd* v. *Timme,* 54 Wis. 318, 11 N. W. 785, the question here under review was presented and most carefully considered. The Constitution of Wisconsin contains a provision (section 1, article 12) that, if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against such amendments separately. An amendment proposed by the legislature and ratified by the people was attacked upon the ground, among others, that it contained several subjects and propositions which had not been separately submitted. In passing upon the objection, the court said: "This provision can have. but two constructions: First, it may be con-

strued, as is contended for by the learned counsel, who contends that the amendment under controversy was not properly submitted, that every proposition in the shape of an amendment to the Constitution, which, standing alone, changes or abolishes any of its present provisions, or adds any new provision thereto, shall be so drawn that it can be submitted separately, and must be so submitted. Such a construction would, we think, be so narrow as to render it practically impossible to amend the Constitution; or, if not practically impossible, it would compel the submission of an amendment which, although having but one subject in view, might consist of considerable detail, and each separate provision, though all promotive of the same object and necessary to the perfection and practical usefulness thereof if adopted as a whole, in such form that a defeat of one of its important matters of detail might destroy the usefulness of all the other provisions when adopted. Take the case as presented by the amendment under consideration. The learned counsel admits that the proposition to change from annual to biennial sessions is so intimately connected with the proposition to change the tenure of office of members of the assembly from one year to two years, that the propriety of the two changes taking place, or that neither should take place, is so apparent that to provide otherwise would be absurd. . . . We think amendments to the Constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to constitute more than one amendment, the proposition submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. Tested by this rule, the propositions submitted to the electors contained but one amendment. It is clear that the whole scope and purpose of the matter submitted to the electors for their ratifica-

tion was the change from annual to biennial sessions of
the legislature. It was so spoken of by the legislative
bodies which passed it, as well as by the electors who
ratified it. To make that change it was necessary, in
order to prevent the election of members of assembly,
half of whom would never have any duties to perform,
that a change should be made in their tenure of office as
well as in the time of their election, and the same may
be said as to the change of the tenure of office of the
senators. . . . The direction in the Constitution re-
quiring separate amendments to be submitted separately
has no efficacy in determining what constitutes an amend-
ment as distinguished from what constitutes two or more
amendments; and, as the word 'amendment' is clearly
susceptible of a construction which would make it cover
several propositions, all tending to effect and carry out
one general object or purpose, and all connected with
one subject, as well as of the construction that every
proposition which effects a change in the Constitution,
or adds to or takes from it, is an amendment, the con-
struction which has been uniformly adopted by all of the
departments of the government for a series of years is
entitled to great weight in settling by judicial decision
what construction should be placed upon it. . . . We
do not contend that the legislature, if it had seen fit,
might not have adopted these changes as separate amend-
ments, and have submitted them to the people as such;
but we think, under the Constitution, the legislature has
a discretion, within the limits above suggested, of deter-
mining what shall be submitted as a single amendment,
and that they are not compelled to submit as separate
amendments the separate propositions necessary to ac-
complish a single purpose.''

Section 1 of the twenty-third article of the Constitution
of South Dakota provides ''that if more than one amend-
ment be submitted they shall be submitted in such man-
ner that the people may vote for or against such amend-

ments separately." A proposed amendment to the Constitution of the state by one section changed the number of regents of the state educational institutions, and by two other sections abolished the trustees of such institutions. These sections were submitted to the people in such a way that each elector was compelled to vote for or against all of the proposed changes. The exact form of the amendment proposed in that case was as follows:
"Proposed Amendment to the Constitution.
   "1. Amendment. That section three (3) of article fourteen (14) of the Constitution be amended so as to read as follows:
   " '3. The state university, the agricultural college, the normal schools and all other educational institutions that may be sustained either wholly or in part by the state shall be under the control of a board of five members appointed by the governor and confirmed by the senate under such rules and restrictions as the legislature shall provide. The legislature may increase the number of members to nine.'
   "2. Amendment. That article fourteen (14) of the Constitution be amended by striking out section four (4) of the same.
   "3. Term of office. From the time of the taking effect of this amendment the term of office of all the trustees theretofore appointed shall cease and determine.
   " 'Shall the above amendment to the Constitution be approved and ratified?'

Yes

No

   "Electors desiring to vote 'yes' will place a cross before the word 'Yes,' and those desiring to vote 'No' will place a cross before the word 'No.' "
   In passing upon the question presented here in reference to the proposed amendment above quoted, the supreme court of South Dakota reached the following conclusion: "Does the resolution contain more than one amendment, within the meaning of the Constitution? It is contended with much apparent reason that two dis-

tinct objects are intended, namely, the abolition of the trustees, and a change in the number and powers of the regents; that these objects are independent of each other; that either might have been adopted without adopting the other; and that there are numerous reasons why an elector might have desired one change, and not the other. The defect in this argument consists in substituting for the real object or purpose one of its incidents. Control of the state educational institutions is the subject to which the proposed amendment relates. Its purpose or object is to place such institutions under the control of a single board. The membership of such board, its powers, and the abolition of the local boards are but incidental to and necessarily connected with the object intended." *State ex rel. Adams et al.* v. *Herried et al.,* 10 S. D. 109, 72 N. W. 93.

In the case of *Lobaugh* v. *Cook et al.,* 127 Iowa, 181, 102 N. W. 1121, we find that the general assembly of the state of Iowa submitted the following amendment to the Constitution of that state (Acts 29th Gen. Assem., p. 199): "Sec. 16. The first general election after the adoption of this amendment shall be held on the Tuesday next after the first Monday in November in the year one thousand nine hundred and six, and general elections shall be held biennially thereafter. In the year one thousand nine hundred and six there shall be elected a governor, lieutenant governor, secretary of state, auditor of state, treasurer of state, attorney-general, two judges of the supreme court, the successors of the judges of the district court whose terms of office expire on December 31st, one thousand nine hundred and six, state senators who would otherwise be chosen in the year one thousand nine hundred and five, and members of the house of representatives. The terms of office of the judges of the supreme court, which would otherwise expire on December 31st, in odd-numbered years, and all other elective state, county, and township officers whose terms of office

would otherwise expire in January in the year one thousand nine hundred and six, and members of the general assembly, whose successors would otherwise be chosen at the general election in the year one thousand nine hundred and five, are hereby extended one year and until their successors are elected and qualified. The terms of offices of senators whose successors would otherwise be chosen in the year one thousand nine hundred and seven are hereby extended one year and until their successors are elected and qualified. The general assembly shall make such change in the law governing the time of election and term of office of all other elective officers as shall be necessary to make the time of their election and terms of office conform to this amendment, and shall provide which of the judges of the supreme court shall serve as chief justice. The general assembly shall meet in regular session on the second Monday in January in the year one thousand nine hundred and six, and also on the second Monday in January in the year one thousand nine hundred and seven, and biennially thereafter.'' It was contended that the proposed amendment violated this provision of the Constitution, and, in passing upon that question, the supreme court of the state of Iowa reached the following conclusion: ''The contention now made is that the general assembly failed to comply with section 2 of the same article, in that the amendment submitted as one in fact contained three distinct and independent amendments to the Constitution: '(1) A change from annual to biennial elections; (2) a change in the office of chief justice from the short-term judge, or one of two short-term judges, to any one of six, and he to be chosen by the legislature; and (3) a proposition to have all elections, including school and municipal elections, at one time.' Is this criticism well founded? 'Section 2 of article 10 directs that, 'if two or more amendments shall be submitted at the same time, they shall be submitted in such manner that the electors shall vote for or against

each of such amendments separately.' The evident purpose of this section is to exact the submission of each amendment to the Constitution on its merits alone, and to secure the free and independent expression of the will of the people as to each. The importance of this cannot be too strongly stated. It excludes incongruous matter and that having no connection with the main subject from being inserted, and thereby obviates the evil of loading a meritorious proposition with an independent and distinct measure of doubtful propriety. The elector, in voting for or against, is limited to ratifying or rejecting the proposition in its entirety, and cannot be put in a position where he may be compelled, in order to aid in carrying a proposition his judgment approves, to vote for another he would otherwise oppose. 2. The amendments contemplated are those to the Constitution, and not necessarily to any particular article or section thereof. The change proposed may affect many parts, and yet constitute but a single amendment, and there may be several independent amendments to a single article. Some difficulty has been experienced elsewhere in determining what shall be included and must be excluded to avoid any infraction of the rule requiring a separate submission. Modifications such as are merely incidental to the main purpose and object sought to be attained are to be included, as essential to the preservation of the symmetry and harmony of the Constitution as a whole. Otherwise great confusion would be possible from the adoption of some and rejection of other incidental changes necessary to accomplish the purpose proposed. It follows that, while an amendment can have but one main object, it should include such additional provisions as are essential, upon its ratification by the people, to render it consistent with other portions of the constitutions. Under the guise of accomplishing this, however, it cannot be loaded with matter not related to or necessarily connected therewith. The right reserved by the

people of voting on amendments separately would be vio-
lated by such a course.'' After reviewing authorities in
other states, the court used the following language: ''The
authorities cited relate to amendments which differ so
radically from that in the instant case that they furnish
little or no aid by way of analogy. They are in accord,
however, as to the principles which should control, and,
when these are fairly applied, there can be no doubt
as to the conclusion which should be reached. Otherwise
provisions for so amending the Constitution as to meet
the changing conditions and needs of the people will
have been so hedged about with difficulties as to render
them practically inoperative.'' The result was that the
submission of the amendment was upheld as not violative
of the constitutional provisions referred to.

Section 9, art. 19, of the Constitution of Montana pro-
vides that, in the submission of amendments to the Con-
stitution of that state, separate amendments must ''be
prepared and distinguished by numbers or otherwise,
that each can be voted upon separately.'' In the case of
*State* v. *Board of Commissioners et al.,* 34 Mont. 426, 87
Pac. 450, the supreme court of that state, in passing upon
a question similar to the one here involved, stated the
rule as follows: ''The next point raised is that, besides
the matter of publication, the legislature cannot legally
submit a proposed amendment in any form which it may
adopt, except the constitutional one, and that, if it do
submit a proposed amendment in any form not author-
ized by the Constitution, its action will be a nullity, the
point being that an examination of the proposed amend-
ment shows that the legislature sought to provide, in the
form of one amendment, for three separate things, to
wit: (1) The election of commissioners for a term of
six years, whereas it had been theretofore only four
years; (2) that it attempts to provide for extending the
term of the then incumbents long after their election;
in other words, to fill certain offices during a certain pe-

riod of time by means of a constitutional amendment; and (3) it provided how vacancies on the board were to be filled, to wit, by the judges of the district court. It is urged that these are three separate and distinct matters submitted in one amendment, and that they were not so clearly distinguished by numbers or otherwise so that each could be voted upon separately. It does not seem to us that these are three separate propositions upon which the people were to be called upon to vote. It is apparent to us, as it must have been to the legislature, that there is only one matter and one subject. The purpose of the legislature was to ask the people at the polls in 1902 whether they wished to amend the Constitution so as to have a board of county commissioners, the term of each commissioner to be six years, one commissioner to go out every two years, with power given to the district judges to fill vacancies at all times in the board, and to have the term of each member of the then existing boards and of short-term boards to be elected in 1902 in new counties extended so that the new system might go into effect on the first Monday in January, 1907. This was all one single scheme, with the single purpose of establishing and maintaining in existence a board of commissioners, two of whom at all times would be experienced men.'' The result was that the amendment proposed was held not to be violative of the constitutional provision above referred to.

Section 2 of article 19 of the Constitution of Colorado contains the following proviso: ''Provided that if more than one amendment be submitted at any general election, each of said amendments shall be voted upon separately, and the votes thereon cast shall be separately counted the same as though but one amendment was submitted.''

In the case of *People ex rel. Elder, Treasurer,* v. *Sours, Treasurer,* 31 Colo. 369, 74 Pac. 167, 102 Am. St. Rep. 34, the supreme court of the state of Colorado, in passing

upon a similar question to the one involved in this case, used the following language: ''At the outset it should be stated that every reasonable presumption, both of law and fact, is to be indulged in favor of the validity of an amendment to the Constitution, when it is attacked after its ratification by the people. In the determination of these questions, we ought constantly to keep in mind the declaration of the people in the Bill of Rights 'that the people of this state have the sole and exclusive right of governing themselves, as a free, sovereign and independent state; and to alter and abolish their Constitution and form of government whenever they may deem it necessary to their safety and happiness;' and we should examine the objections which have been raised against the validity of this amendment from the viewpoint of a fair and liberal construction, rather than from that of one which unnecessarily embarrasses the exercise of the right of amendment. . . . It is next contended that the proposed amendment contains several subjects, and therefore is in fact several amendments, and that the Constitution requires that each amendment shall be separately submitted. The Constitution does not require the submission of separate subjects. . . . The final question is whether or not more than one amendment is embraced in article 20. Having reached the conclusion that it has but the one general purpose indicated, and that it does not amend any of the preceding articles in the constitutional sense contemplated by article 19, that question is easily answered. Its several provisions with respect to the particular governmental subjects which it covers are each dependent upon the other in order to effect the main purpose, and therefore do not come within the provision requiring several amendments to be submitted separately. In other words, the whole scope and purpose of the amendment was to provide home rule for certain cities with respect to certain governmental matters local in their nature. This is apparent from the

contents of the amendment itself, as well as the provision designating what should appear upon the official ballot in order to enable the electors to vote for or against its adoption. Its several provisions all relate to this one general object, and are designed to accomplish this one purpose, in so far as they relate to cities designated in the amendment either by name or class, so that, as a whole, it constitutes but one amendment, having but one subject and one purpose."

The Constitution of the state of Missouri, article 15, section 2, provides that, in submitting amendments to the Constitution to the people to be voted upon, "the proposed amendment shall be submitted to a vote of the people, each amendment separately." A constitutional amendment (Laws 1899, p. 381) was submitted to the legislature of that state in the following words: "Seventh Constitutional Amendment. Providing that, in courts not of record, two-thirds of the jury may render a verdict in civil cases; in courts of record, three-fourths of the jury."

In the case of *Gabbert* v. *Chicago, R. I. & P. Ry. Co.*, reported in 171 Mo. 96, 70 S. W. 893, the court, in discussing the question of whether this seventh proposed amendment constituted a separate amendment, said: "(2) But it is further insisted that 'two separate amendments were submitted together in the seventh or petit jury amendment.' Indeed, the circuit court gave as a reason for granting the new trial that 'two separate amendments were submitted together in the ballot voted by the people.' . . . So that the question for decision is: Did the proposed seventh constitutional amendment contain two amendments, instead of one? We repeat it again, for convenience, section 28 of article 2 of the Constitution, so far as it relates to petit juries: 'The right of trial by jury as heretofore enjoyed, shall remain inviolate, but a jury for the trial of criminal or civil cases, in courts not of record, may consist of less than twelve

men as may be prescribed by law.' The amendment proposed was, 'and that a two-thirds majority of such number prescribed by law concurring, may render a verdict in all civil cases, and that in a trial by a jury in all civil cases in courts of record, three-fourths of the members of the jury concurring may render a verdict.' This is the pivotal point in this case, for, notwithstanding the legislature may have submitted the seventh amendment, and notwithstanding a clear majority of the qualified voters of the state voted for it, and the secretary of state certified on his canvass of the votes that it was adopted, if it be true that two amendments, within the meaning of the organic law itself, were jointly submitted, then neither has become a part of our fundamental law; and whether it contained only one, as insisted by plaintiff, or two, as contended by defendant, is a judicial question, to which this court has the power to respond, and decide. . . . The requirement that amendments shall be separately submitted is mandatory. The difficulty, and the only difficulty, is in determining in a given case what is a single amendment. It is obvious that an amendment may be one, and yet include several changes and incidents, all germane to its one controlling purpose. . . . There is no occasion for cutting the amendment in two, when, as it stood, it abolished the common-law rule of unanimity in all civil cases, whether in courts of record or courts not of record, and then provided for the majority in each in the connection in which the Constitution had grouped them. The observation of Judge STORY commends itself at this juncture: 'Constitutions (and, we may add, amendments to constitutions) are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted

for common understandings. The people make them, the people adopt them, the people must be supposed to read them with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary law.' 1 Story, Const. 451; Black Interp. Laws, 28. This amendment related to one subject, proposed the abolition of the rule of unanimity and a substitute for it in the two cases which the Constitution had already grouped into one section—juries in courts of record and courts not of record. The remainder was incidental detail. It results that, in our opinion, the seventh amendment is not obnoxious to the criticism so ingeniously and ably urged against it.''

One of the provisions of article 256 of the Constitution of the state of Louisiana (1879) provides that ''when more than one amendment shall be submitted at the same time they shall be submitted so as to enable the electors to vote on each amendment separately.''

In 1890, at a regular session of the general assembly of the state of Louisiana, an amendment was proposed to the Constitution of that state, which was reviewed by the supreme court of that state in the case of *State* v. *Secretary of State*, 43 La. Ann. 590, and which is also found in 9 So. 776. In stating the provisions of that amendment, the supreme court of the state of Louisiana reviewed the same as follows: ''Concisely stated, the proposition contained in the amendment is to incorporate into the Constitution 'an article on levees, schools, charities, pensions, drainage, and lotteries;' and which is given the character of a contract, which stipulates that ''in consideration of the sum of thirty-one millions two hundred and fifty thousand dollars, . . . John A. Morris, his heirs, agents and assigns, are hereby authorized and empowered for the term of twenty-five years ensuing the first day of January, 1894, to prepare schemes of lotteries, to sell lottery tickets, and to draw and conduct lotteries in this state.' Following the contracting clause is

the stipulation that the money 'shall be paid to the treasurer' in installments. Then follow other provisions stipulating how the fund shall be applied, and they require that of the total sum there shall be paid, in quarterly installments: '(1) To the public schools, three hundred and fifty thousand dollars annually; (2) to levees, three hundred and fifty thousand dollars annually; (3) to charities, one hundred and fifty thousand dollars annually; (4) to pensions, fifty thousand dollars annually; (5) to the city of New Orleans, for drainage and other sanitary purposes, one hundred thousand dollars annually; (6) to the general fund, two hundred and fifty thousand dollars annually.' Then follow other provisions in regard to these several funds, one of the most pertinent of which is that 'the several sums of money above specified shall be devoted to the objects and purposes hereinbefore stated, and the general assembly is hereby directed to carry into effect this provision by appropriate legislation." In commenting upon the question which was raised in that case, whether the foregoing amendment was in conflict with the provision of article 256 of the Constitution hereinbefore referred to, Judge WATKINS, the organ of the court, said: "Disincumbered of its verbiage, the foregoing is a fair analysis of the measure proposed. The question for solution is, Does this proposition constitute and contain the substance of more than one amendment, and violate, either in terms or by fair implication, the following provision of article 256 of the Constitution, viz.: When more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately. In determining whether the proposed amendment is amenable to the constitutional objection urged, relator's counsel makes the following admission, viz.: 'But I concede that the test to be applied to ascertain the oneness of the amendment is to be found in article 29 of the Constitution, which provides that every law enacted by the gen-

eral assembly shall express but one .object, and that shall be expressed in the title, and the oneness of a law, under the article, is tested by the oneness of the object which the law has in view; and that is the test to be applied to the oneness of an amendment. The decisions are that when a law has but one general object, which is indicated by its title, every means or end necessary to accomplish the object is embraced in the title. Cooley, Const. Lim., p. 172. The generality of the title is no objection to the law so long as it is not made to cover incongruous legislation. The title of the act need not be a synopsis of its contents.' . . . Article 29 reads as follows, viz.: Every law enacted by the general assembly shall embrace but one object, and that be expressed in the title. We have been unable to find, and have been cited to but one case in which this question has been treated, and that is *State* v. *Timme,* 54 Wis. 318, 11 N. W. 785, in which the court says: 'We think amendments to the Constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view.' That decision is in strict keeping with the provisions of article 29 above quoted. Keeping in view the analysis of the proposed amendment, *supra,* and we take it to be clear that there is but one object mentioned therein, and that is the extension of relator's lottery contract for a term of twenty-five years. All other provisions and stipulations therein contained relate to the consideration the relator contracted to pay therefor, and the destination, in general terms, of the sums to be by him paid into the state treasury.''

We have entered at tedious length into the details of the cases hereinbefore referred to, in order to show not only what was announced to be the proper construction of amendments similar to the one involved in the instant case, but also to show the exact state of the question as presented to the several courts.

Having examined the authorities in order to get a general view of the case, let us now turn to the concrete case presented by this record. Section 273 of the Constitution of Mississippi is as follows: "Section 273. Whenever two-thirds of each house of the legislature shall deem any change, alteration, or amendment necessary to this Constitution, such proposed change, alteration, or amendment, shall be read and passed by two-thirds vote of each house respectively, on each day, for three several days; public notice shall then be given by the secretary of state, at least three months preceding an election, at which the qualified electors shall vote directly for or against such change, alteration, or amendment; and if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately; and if it shall appear that a majority of the qualified electors voting shall have voted for the proposed change, alteration, or amendment, then it shall be inserted by the next succeeding legislature as a part of this Constitution and not otherwise."

Section 153 of the Constitution of the state of Mississippi adopted by the Constitutional Convention of 1890 is as follows: "Section 153. The judges of the circuit courts and of the chancery courts shall be appointed by the governor, with the advice and consent of the senate, and shall hold their offices for the term of four years."

Section 153 of the Constitution as amended is as follows: "Section 153. The judges of the circuit and chancery courts shall be elected by the people in a manner and at a time to be provided by the legislature and the judges shall hold their office for a term of four years."

The exact question here presented is whether the proposition submitted by the legislature to convert section 153, as originally found in the Constitution, into section 153 as amended involved more than one amendment. If it did, then the submission of the proposed

amendment to the people violated the provisions of section 273 of the Constitution, requiring that "if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately," and the amendment must necessarily fail.    If it did not violate this provision of section 273 of the Constitution, the amendment, having received the necessary vote when submitted to the people as required by the Constitution, must stand.    The original section only contains a single sentence, which is embraced in less than three lines, and the amendment as proposed is no longer, and the only change proposed consists in the substitution of the words "elected by the people in a manner and at a time to be provided by the legislature," found in the amendment, for the words "by the governor with the advice and consent of the senate," found in the original. The only subject dealt with was the method of selecting the judges of the circuit and chancery courts, and the only change contemplated was that their selection should thereafter be by election by the people, instead of appointment by the governor with the advice and consent of the senate.    In other words, the whole proposition submitted by the proposed amendment was the substitution of an elective for an appointive judiciary, so far as it applies to the method of selecting the judges of the circuit courts and the chancery courts in this state.

Counsel for appellee, in a very strong and frank presentation of their contention that the proposed change involves two amendments, and that the proposition should have been split into two amendments—one providing for the election of the judges of the circuit courts, and another providing for the election of the judges of the chancery courts—admit that their position means that the framers of the Constitution intended to make the amendment of the same difficult of accomplishment. To use their exact words: "It was intended to be difficult, not impossible, but difficult; and every obstruction

that able and ingenious minds could bring to bear upon the procedure by which this was to be done, and yet preserve the right so that it might be called into play in cases of absolute necessity was placed in the way of a change in this instrument.'' Unquestionably the framers of the Constitution intended to guard against the improvident submission of amendments to the same, and this they did by providing that ''such proposed change, alteration or amendment, shall be read and passed by a two-thirds vote of each house respectively on each day for three several days; public notice shall then be given by the secretary of state at least three months preceding an election, at which the qualified electors shall vote directly for or against such change, alteration or amendment; and if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against such amendment separately, and if it shall appear that a majority of the qualified electors voting shall have voted for the proposed change, alteration or amendment then it shall be inserted by the next succeeding legislature as a part of this Constitution, and not otherwise.''

However, the same Constitution which contains the above quoted section in reference to amendments also contains the following provisions in the bill of rights, viz.:

''Sec. 5. All political power is vested in, and derived from, the people; all government of right originates with the people, is founded upon their will only, and is instituted solely for the good of the whole.

''Sec. 6. The people of this state have the inherent, sole, and exclusive right to regulate the internal government and police force thereof, and to alter and abolish their Constitution and form of government whenever they deem it necessary to their safety and happiness; provided, such change be not repugnant to the Constitution of the United States.''

106 Miss. 36

That the people of the state, acting through the constitutional convention which framed the Constitution, intended to impose and did impose certain limitations upon amendments that that instrument which must be strictly followed before the same can be amended, we entertain no sort of doubt, but, in determining whether an amendment has been properly submitted after the same has been ratified by the requisite majority of the vote cast, we should examine into the matter of the spirit and according to the rule established by this court in the case of *Green* v. *Weller,* 32 Miss. 664, in which Judge HANDY, speaking for the court, said: "There is nothing in the nature of the submission which should cause the free exercise of it to be obstructed, or that could render it dangerous to the stability of the government, because, the measure derives all of its vital force from the action of the people at the ballot box, and there can never be danger in submitting, in an established form, to a free people, the proposition whether they will change their fundamental law. The means provided for the exercise of their sovereign right of changing their Constitution, should receive such a construction as not to trammel the exercise of the right. Difficulties and embarrassments in its exercise are in derogation of the right of free government, which is inherent in the people."

Commenting upon what constitutes "one amendment," or "an amendment to more than one article of the Constitution," Dodd on "The Revision and Amendment of State Constitutions," says: "These restrictions have given rise to some judicial discussion as to what is 'one amendment' or 'an amendment to more than one article' of the Constitution. With reference to this matter the courts have ordinarily taken a liberal and common-sense view. In the Illinois case of *City of Chicago* v. *Reeves,* 220 Ill. 274, 77 N. E. 237, an amendment adopted in 1904 was attacked as altering more than one article of the Constitution. The court rejected this contention and

said that the restriction 'was not intended to prevent implied amendments or changes which were necessarily worked in other articles of the Constitution by the express amendment of a particular article of the Constitution. Any other view would be so narrow as to prohibit the general assembly in many, if not in all, cases, proposing amendments to a particular article of the Constitution,' inasmuch as the several articles are closely interrelated and interdependent. As to what may be considered one amendment the courts have in most cases pursued a liberal policy. A Wisconsin constitutional amendment, of 1881 provided for the substitution of biennial for annual legislative sessions, and also adjusted the legislative elections and salaries to the new biennial system. To the contention that this measure really constituted more than one amendment the court replied: 'Such a construction would, we think, be so narrow as to render it practically impossible to amend the Constitution. . . . Certainly no good could result from a separate submission which is not equally as well and better accomplished by submitting them together as one amendment; and the separate submission might result in the absurdity of the ratification of the one and the rejection of the other. . . . In order to constitute more than one amendment, the proposition submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with the other.' Similarly a recent amendment in Iowa which had for its object the substitution of biennial for annual legislative sessions, was attacked on grounds similar to the Wisconsin amendment, and the court replied: 'If the amendment has but one object and purpose, and all else included therein is incident thereto, and reasonably necessary to effect the object and purpose contemplated, it is not inimical to the charge of containing more than one amendment.' In Colorado an amendment adopted in 1902 provided (1) for the con-

solidation of the city of Denver and county of Arapahoe,
and for the framing of a charter by the new municipal
corporation, and also (2) for the framing of home-rule
charters by all cities of the first and second classes with-
in the state. These two matters were separate and inde-
pendent, and might well have been submitted as two
amendments, but the Coloradu court decided: 'That an
amendment may embrace more than one subject. That
if an amendment embraces more than one subject, said
subjects need not be separately submitted if they are
germane to the general subject of the amendment, and
if they are so connected with or dependent upon the gen-
eral subject that it might not be desirable that one be
adopted and not the other.' The view expressed by the
Colorado court is a sound one, but there is room for dif-
ference of opinion as to whether the amendment under
consideration did not violate the rule. A stricter view of
this matter has been taken by the supreme court of Mis-
sissippi. A proposed amendment submitted to the peo-
ple of that state in 1899 provided for the popular election
of judges, and also contained rules regarding the nomi-
nation and election of judicial officers. The supreme
court declared that this measure was really four amend-
ments in that it provided (1) for the popular election of
judges of the supreme court, (2) for a similar method of
choosing circuit judges, and (3) chancellors, and (4) for
methods of nominating and electing these officers. The
court said: 'Whether amendments are one or many
must be solved by their inherent nature, by the consid-
eration whether they are separate and independent each
of the other so as that each can stand alone without the
other, leaving the constitutional system symmetrical, har-
monious, and independent on the subject.' The test ap-
plied by the Mississippi court is too narrow; in many
cases matters which might stand alone may, it would
seem, properly be embodied in the same amendment if
they related to the same subject and are designed to ac-

complish the same purpose; in the case under discussion the question of electing judges by a popular vote is one of this character, although, as the court says, it might be possible to provide separately for the method of choosing each grade of judges; if the method of electing all judges be taken as one proper to be included in one amendment, certainly rules for the nomination and election of such judges are merely incidental to the main purpose of the proposal. The Mississippi decision can hardly be considered a sound one and is perhaps not entitled to very great weight in this connection, inasmuch as the amendment in question was also held to be invalid for other reasons.'' See pp. 179, *et seq.*

The provision of the Constitution here under review first found a place in this state in the Constitution of 1868, where it appears just as it now appears, except that the words ''qualified electors voting'' were followed by the words ''for members of the legislature,'' which are omitted in the present Constitution.

Section 17, article 6, of the Constitution of 1868, provided that: ''The legislature shall divide the state into a convenient number of chancery districts, to be composed of not more than four counties.'' It also provided for the appointment of chancellors for each district, and that a chancery court should be held in each county of the state ''four times in each year.'' An amendment was proposed to this section of the Constitution in 1872 by the legislature of the state, which contemplated two distinct changes; one being the omission of the words ''not more than four counties,'' thus enabling the legislature, if it saw fit, to reduce the number of chancery court districts; and the other being the substitution of semiannual for quarterly terms of the chancery court in each county. This proposed amendment was adopted by the people, and became a part of the Constitution. The result was that the chancery court districts of the state were reduced by the legislature from twenty to ten, and

the further result was courts were held in each county but twice a year instead of four times a year, as had been the custom under the original provision of the Constitution. A still further result was that twenty chancellors were deprived of office, and one P. P. Bailey, who was thus deprived of what he conceived to be a constitutional right in a term of office, brought suit against the state to recover the balance of his salary, and the court, in an opinion delivered by Judge CAMPBELL, held that he was not entitled to recover, and thus upheld the amendment in its full force and vigor. It is proper to state in this connection that the point here raised was not raised in this case. *Bailey* v. *State,* 56 Miss. 637. This submission of an amendment certainly involved more than one matter or subject. It embraced in its sweep the possibility of changing every chancery court district in the state, and also the right of every judge of the chancery court in the state to hold office. It also reduced the number of terms of chancery courts to be held in each county of the state by one-half. All of these subjects or objects were inevitably involved in the amendment which was submitted as one amendment. Laws of 1872, p. 163.

Section 6, art. 8, of the Constitution of 1868, created the common school fund to be derived from a number of enumerated sources, and provided that it should be "invested in United States bonds and remain a perpetual fund which may be increased but not diminished, the interest of which shall be inviolably appropriated for the support of free schools." In 1873 an amendment was submitted, and adopted and inserted in 1876 (see Laws of 1873, p. 135, and of 1876, p. 1). This amendment eliminated from the original section the following provisions: First, that the school fund shall consist of the proceeds of the sales of "swamp land;" second, of the money paid as an exemption for military duty; third, of the fund arising from the consolidating of congressional

township funds; fourth, of all moneys, donated to the state for school purposes; fifth, that the money composing the school fund should be invested in United States bonds; and sixth, that it should remain a perpetual fund not to be diminished, the interest only being used. This amendment certainly embraced several subjects and contemplated several changes, any one of which could have been made without affecting the remainder.

Again in 1876 (Laws 1876, p. 30) the following amendment to the Constitution of the state was proposed:

"A resolution proposing an amendment to the Constitution of the state of Mississippi.

"Resolved by the legislature of the state of Mississippi, two-thirds of each branch concurring therein, that the following articles be proposed to the qualified electors of this state, as an amendment to the Constitution of this state, to be voted upon by them at the next general election to be held in this state, either for approval or rejection, which, if approved by their vote, shall be valid as a part of the said Constitution, namely:

"Article XIV.

"Sec. 1. Section eleven of article four, and fourteen, fifteen, sixteen, seventeen, and eighteen, of article five of the Constitution of this state, are hereby abrogated and annulled.

"Sec. 2. The senate shall choose a president from its members.

"Sec. 3. When the office of governor shall become vacant by death or otherwise, the president of the senate shall possess the powers, and discharge the duties of said office, and receive compensation, as the governor, during the remainder of the term of such governor.

"When the governor shall be absent from the state, or unable, from protracted illness to perform the duties of his office, the president of the senate shall discharge the duties of said office, and receive said compensation,

until the governor be able to resume his duties; but if from disability or otherwise, the president of the senate shall be incapable of performing said duties, or if he be absent from the state, or if there be no president of the senate, then the speaker of the house of representatives shall assume the office of governor and perform said duties, and receive the same compensation as the governor; and in case of inability of the foregoing officers to discharge the duties of governor, the secretary of state shall convene the senate to elect a president, who shall assume the office of governor, and discharge the duties and receive the compensation thereof.

"By limitation, February 24, 1876."

The real object of this amendment was to dispense with the office of lieutenant governor in the state, and to impose the duties of his office upon others. On its face it deals with several sections of the Constitution, and deals with several subjects. It never was adopted, but the manner of its submission is a part of the judicial history of the state, and shows the contemporaneous construction of the question in hand by the legislative department of the state at that time.

The amendment of 1872, which was proposed and adopted, the decision of the case of *Bailey* v. *State,* the amendment of 1873, which was also adopted, and the proposed amendment of 1876, must all be treated as familiar history to the framers of the Constitution of 1890, one of the provisions of which now under review was again re-enacted in that Constitution, and this contemporaneous construction of the same provision in the Constitution of 1869 must be remembered in determining the proper construction here.

"In construing a constitutional provision, the meaning of which cannot be ascertained from the language used, the courts will consider the contemporaneous, practical construction placed on it by the legislature and public, and uniformly acquiesced in. *Chrisman* v. *Brookhaven,* 70 Miss. 477, 12 So. 458."

"Where there is any ambiguity or doubt, or where two views may be well entertained of the meaning of a constitutional provision, the legislative construction thereof, is entitled to great weight. *Dantzler Lumber Co.* v. *State,* 97 Miss. 355, 53 So. 1."

Section 90 of the Constitution of the state provides that: "The legislature shall not pass local, private, or special laws in any of the following enumerated cases, but such matters shall be provided for only by general laws." The "enumerated cases" referred to are divided into paragraphs, 21 in number, which run the whole gamut of pitfalls incident to private legislation, and embrace, among other things in different sections, the grant of the right to a person or a corporation to "have a fishtrap" as also the grant of "lands under the control of the state to any person or corporation." This provision of our Constitution first found a place in the same in the Constitution framed by the convention of 1890. It is not impossible that in the near future, in these times "given to change," some legislature of the state might desire to restore the original order of things, and for that purpose to submit an amendment to the Constitution abrogating the section. If so, the question arises how many amendments would be required to effectuate the change. There is no duplication of subjects to be found in the "enumerated cases" mentioned in the list of private laws which are prohibited by this section of the Constitution. If the separate subject ballot or voting test is to be applied, it is certain that there are some provisions of this section which most of our citizens would object to having changed, such as changing the law of descent and distribution, "regulating the rate of interest on money," and "granting divorces." At the same time, there are some subjects embraced in the inhibition which the voters might desire to change. Very few of us would feel that any great calamity would befall the state if the legislature should once more be al-

lowed to grant the right to an individual to have a "bridge, road, or fish-trap" by a private act, and many of the citizens of the state might pick out of the inhibitions some which they preferred to abolish.

If, in the submission of any amendment to the Constitution, the legislature must split the same into as many subjects as are involved in the change, and so present the same that the voters of the state shall have an opportunity to express themselves on every detail which the change involves, then to amend section 90 of the Constitution would require the submission of quite a number of amendments, and, if in the process of time there should be a number of amendments to various sections of the Constitution adopted by the people of the state, the Constitution would become an interminable mass instead of a simple, compact, and orderly expression of the organic law of the state. If the framers of the Constitution had intended to limit the submission of amendments to the Constitution in such a way that each amendment should embrace but "one subject," they could have done so just as they provided in section 69 of article 4, that certain appropriations mentioned therein "shall be made by separate bills, each embracing but one subject." The fact that this limitation is found in section 69, and is not found in section 273, of the Constitution, is a circumstance which cannot be ignored in the construction of the latter section. In the one case, that mentioned in section 69, the Constitution was dealing with the legislature on a vital question, viz., the matter of appropriating the people's money, and the mandate enters into detail and provides not only that certain appropriations must be made by separate bills, but the bill itself should embrace but one subject. No such limitation is found in section 273 of article 15, providing for the submission of a constitutional amendment to the people, and, in our judgment, no such limitation should be read into it by construction.

Counsel for appellee have most earnestly insisted that it is easier, under the constitutional scheme, for the legislature to call a constitutional convention than it is for it to submit a proposed constitutional amendment, and insists that this furnishes a reason for a strict construction of that provision of the Constitution authorizing the submission of such amendments to the people to be voted upon.

It is doubtless true that the plan for calling a constitutional convention heretofore adopted in this state is simpler and requires less detail and a smaller number of votes in the legislature than the constitutional plan of submitting amendments, but we fail to see what effect this fact should have in the construction of any provision of the Constitution. The fact is that, in calling a constitutional convention and providing for the election of the members thereof, the legislature commits itself to no constitutional provision or amendment thereof, but simply provides for a convention which may or may not change the existing Constitution according to the will of the members thereof, whereas, in submitting a constitutional amendment to the people for ratification, the legislature commits itself to the specific proposition contained therein. Reduced to its last analysis, the objection urged against the form of submission of the amendment under review is that it provided for the election of the judges of two different courts having different jurisdictions, and does not give the voter an opportunity to cast his ballot for one proposition and against the other, if he saw fit to do so, all of which is true; but there is no provision in the section providing for the submission of amendments to be voted upon so that each subject involved in the same shall be so divided that a voter shall have the privilege of voting a ballot which is exactly conformed to his wishes. As the proposition was submitted, the voters of the state had an opportunity to say whether they desired the election of the judges of the two courts

of original jurisdiction named therein. Justices of the peace, the only other judges in the state having original jurisdiction, were already elective and, by adding the judges of the circuit and of the chancery courts, all judges of courts of original jurisdiction in the state became elective. The judges of the appellate court were to remain appointive, and in this simple manner the amendment was submitted and carried by a vote of nearly five to one. Many of the state Constitutions which have been adopted by the people have been submitted for approval or rejection as a whole, and had to be voted upon as a whole, as was done in this state in 1868. In view of this indisputable historical fact, what becomes of the argument that, in voting for an amendment to a single article of the Constitution, the voter should have it "made to order" as it were so that he can get exactly what he wants?

Finally it is urged that we should take into consideration the great number of voters in the state who have not expressed themselves on the subject at all, and who, it is said, are presumed to prefer, or at least to be satisfied with, the existing order of things. It is a lamentable fact that less than twenty-five thousand voters took interest enough to vote on so important an amendment to the Constitution as the one here being considered, but, the amendment having received the requisite majority of the vote cast, we cannot consider the vote which found no expression in the ballot box. As was stated by the court in the case of *Green* v. *State Board of Canvassers,* 5 Idaho, 130, 47 Pac. 259, 95 Am. St. Rep. 169 *et seq.,* in referring to the voter who did not vote: "These electors either have no opinion on the subject, or they have none that they care to express. Why should they be counted as having voted in the negative, when they did not vote at all on the subject?"

The exceedingly narrow construction which we are urged to place upon the section of the Constitution under

consideration is not only not supported by the general trend of the decisions of our own court on cognate subjects, but is expressly negatived thereby, as will be seen by a reference to the following authorities: Section 3008 of the Annotated Code of Mississippi provides that "an ordinance shall not contain more than one subject, which shall be clearly expressed in its title." The meaning of this provision came before this court for consideration in the case of *Town of Ocean Springs* v. *John M. Green*, reported in 77 Miss. 472, 27 So. 743. Ordinance No. 109, which was passed by the mayor and board of aldermen of the town of Ocean Springs, is entitled: "An ordinance entitled an ordinance to prevent the carrying or exhibiting deadly weapons." One Green was arrested under a charge made by affidavit before the mayor of Ocean Springs "with exhibiting a pistol in said town in a rude, angry, and threatening manner not in necessary self-defense." It was contended that the ordinance above referred to was void because the title of the same contained more than one subject, and was obnoxious to section 3008 of the Annotated Code. In passing upon that contention, TERREL, J., delivering the opinion of the court, said: "The subject of ordinance No. 109 is deadly weapons, or of criminal acts committed with deadly weapons, or any and all acts committed by the use of deadly weapons which the municipality may choose to prohibit, might have been properly included under said title. We are of the opinion that ordinance No. 109 contains but one subject."

Section 3406 of the Code of 1906 provides that: "An ordinance shall not contain more than one subject, which shall be clearly expressed in its title." In 1909 an ordinance was passed by the town of Magnolia, the title of which is as follows: "An ordinance declaring all violations of the penal laws of the state of Mississippi under the Code of 1906 be and the same are hereby declared a violation of the ordinances of the town of Magnolia."

Section 1 of the ordinance provided "that all offenses under the penal laws of Mississippi amounting to a misdemeanor shall . . . be offenses against said town," etc. One Richards was charged and convicted of unlawful retailing within the town limits, and it was urged that the ordinance was void because it did not conform to the title of the same. In answer to this argument, MAYES, J., in delivering the opinion of the court, said: "In the next place there is nothing in the title that can make the ordinance void. The statute only requires that the subject of the ordinance 'be clearly expressed' in the title. Surely this ordinance clearly expressed its subject in the title. It is true the title is broader than the ordinance, but the title deals with all subjects contained in the ordinance. The title professes to deal with 'all penal laws' of the state; whereas, the ordinance only deals with such as are 'misdemeanor.' The title is not deceptive or misleading. It calls attention to the fact that the ordinance is dealing with one subject, to wit, the penal laws of the state; and the ordinance itself is within the power of the municipality to deal with that subject. The very sweep of the title is more likely to call attention of those enacting it to the body of the ordinance than would a more restricted title. The object of the law in regard to having the title clearly expressed in the ordinance is to prevent surprise or fraud on those engaged in enacting the ordinance. It is to fairly apprise the legislature and the people of the subjects of legislation contained in the body of the legislative act or ordinance, to the end that those engaged in enacting the law may know how to vote intelligently, and those expected to obey it may be fully apprised as to what it is. If the title fairly gives notice of the subject of the ordinance, so as to reasonably give notice and lead to an inquiry into the body, that is all that is necessary. See *State* v. *Bryan*, 50 Fla. 293, 39 So. 929."

In 1904 the legislature of this state passed a bill for the relief of one Carter. By section 1, it was provided

that the sum of seven hundred and forty dollars and six cents "be and the same is hereby appropriated to be paid out of the state treasury from moneys not otherwise appropriated as a donation to J. W. Carter, a citizen of Kemper county, to reimburse him for said amount paid into the state treasury through a collection made by the revenue agent in November, 1900." By section 2, it was provided that the board of supervisors of Kemper county were authorized to allow said Carter the sum of one thousand seven hundred and eighty dollars and sixty-two cents. The auditor of public accounts refused to issue a warrant on the state treasury for the amount to be paid by the state, and a mandamus proceeding was instituted by Carter to force him to do so. The auditor raised the specific objection that the bill was unconstitutional for the reason, among other things, that it violated a provision of section 69 of article 4, which provided that "all other appropriation bills shall be made by separate bills each embracing but one subject," and this view was urged upon the supreme court of the state. CALHOUN, speaking for the court, said: "We do not think the act for the relief of J. W. Carter obnoxious to any of the objections so strongly put by counsel." See *Henry* v. *Carter,* 88 Miss. 21, 40 So. 995. The two sections of the bill, the one relating to the donation of the amount to be paid out of the state treasury, and the other allowing the board of supervisors of Kemper county to pay another amount, treated of separate matters, and either provision could have stood by itself.

In the case of *Winfield* v. *Jackson,* reported in 89 Miss. 276, 42 So. 184, the supreme court of this state held that "an ordinance providing that all offenses made misdemeanors under the state laws shall be violations of the municipal laws contains only one subject, under section 3008, Ann. Code 1892."

The determination of the question here under review would have been much easier for the court but for the

fact that this court, on a former occasion, held that the submission of an amendment to the Constitution, providing for the election of judges and chancellors, constituted more than one amendment, and therefore violated section 273 of the Constitution of the state. *State of Mississippi, on relation of Monroe McClurg, attorney-general,* v. *Robert Powell,* 77 Miss. 543, 27 So. 927, 48 L. R. A. 652. It is true that the amendment proposed in that case was very much more complex and complicated than the amendment proposed in the instant case, and it is also true that the decision of that case did not necessarily involve the particular question here involved, and, in our opinion, the right result was reached by the court, but we cannot escape the conclusion that this particular question came under review by the court, and that the court held that the submission of an amendment to the Constitution providing for the election of judges and chancellors was not permissible under section 273 of article 15 of the Constitution of the state. It is impossible for us to concur in that view, and we must decline to follow it.

We are not unmindful of the fact that it is very important that the decisions of courts on constitutional questions should be uniform, harmonious and consistent, and that, as stated by Black on Constitutional Law, "an interpretation once deliberately put upon the provisions of such an instrument should not be departed from without grave reasons." On the other hand, we must remember that the nature of our government is such that the Constitution is necessarily committed into the keeping of this court; and, when this court has erroneously interpreted that instrument, and no harm can follow the correction of such erroneous interpretation, its plain duty is to do so, and thereby enable the express will of the people to be carried into effect. Especially is this true when the erroneous interpretation has restricted the people in the exercise of a right which they have expressly reserved to themselves.

In the language of CHALMERS, C. J., in *Beck* v. *Allen,*
58 Miss. 174: "If it was wrong," referring to a prior
construction of the Constitution, "it should be corrected;.
since, to a construction of the Constitution relating solely
to a question of public administration, and which cannot
involve rights of private property acquired upon the
faith of the decision, the doctrine of *stare decisis* can
have no proper application." And in the language of
GEORGE, C. J., in *Lombard* v. *Lombard,* 57 Miss. 177:
"On constitutional questions, where the former decision
refused a right reserved to individuals as against the
power of the government, or where it impaired the pow-
ers of the people or their representatives to prevent mal-
administration by their officers and agents, or sanctioned
an alienation by the legislature of powers conferred for
the public good, I (we) should feel little hesitation in
departing from it when satisfied of its incorrectness."
In *Garland* v. *Rowan,* 2 Smedes & M. 631, the court acted
upon the theory that, "when a single case stands un-
supported, and rests upon an unsound basis or an erro-
neous application of principles, it is better, in the lan-
guage of an eminent judge, 'to abandon it, than at-
tempt to build upon it.' "

The principle of *stare decisis,* however, in so far as
the Powell case is concerned, has in fact very little, if
any, application here; for the rule announced in that case,
with reference to the matter here under consideration,
is not supported by authority, but, since its announce-
ment, has not been followed by this court in dealing with
cognate matters as hereinabove pointed out; and it has
therefore, for all practical purposes, been, in effect, al-
ready overruled. Moreover, however important it may
be that the decisions of courts on constitutional ques-
tions should be uniform, harmonious, and consistent, the
fact is in Mississippi there is already a want of har-
mony in the decisions of this court in reference to the
rule which should be observed in the construction of the

provisions of the Constitution in reference to the submission of amendments thereto, and all we can do is to follow the rule on this subject laid down in the case of *Green* v. *Weller,* 32 Miss. 650, or the rule laid down in the Powell case, hereinbefore referred to. We cannot follow both. It is true that precisely the same questions were not involved in each case, and that the Powell case does not in terms either overrule or criticise the decision of the court in the former case; yet no man can read these two decisions in reference to the exact question here involved and not be impressed with the idea that they breathe an altogether different spirit, in reference to the rule of construction which should be adopted in passing upon proposed amendments to the Constitution.

In the case of *People* v. *Sours,* 31 Colo. 369, 74 Pac. 167, 102 Am. St. Rep. 34, we find that the supreme court of Colorado quotes at length and with approval the opinion of this court in the case of *Green* v. *Weller,* hereinbefore quoted, in support of the submission of a constitutional amendment which was proposed in that state. The result was that the submission which was objected to upon precisely the same grounds as are urged here was upheld. The court, in passing upon the question, says: "At the outset it should be stated that every reasonable presumption, both of law and fact, is to be indulged in favor of the validity of an amendment to the Constitution when it is attacked after its ratification by the people." On the other hand, we find in the same case there was a dissenting opinion delivered by one of the judges, who relied upon the Powell case to sustain his view of the matter, and he reached the conclusion that the amendment which had been upheld by the court was subject to the same constitutional objections which are now urged against the amendment in the present case.

If this attitude of the law in this state, we are constrained to follow the general rule announced in the case of *Green* v. *Weller,* in reference to the proper interpreta-

tion to be placed upon the proposed amendment to the Constitution by the legislature, rather than the rule adopted in the Powell case, because the rule in the former case adopted before the constitutional provision here under review was adopted in this state is more in harmony with the trend of our decisions on cognate subjects, and, above all else, because we believe it is correct. In considering a similar question in the case of *Pioneer Irrigation District* v. *Bradley,* 8 Idaho, 310, 68 Pac. 295, 101 Am. St. Rep. 201, the supreme court of Idaho stated: "There is scarcely any subject of legislation that cannot be divided and subdivided into various heads, each of which might be the basis of a separate act." Another succinct statement of the proper rule as we understand it is found in the case of *State ex rel. Hudd* v. *Timme, Secretary of State,* 54 Wis. 318, 11 N. W. 785: "No one would contend but that it would have been entirely competent under the Constitution for the legislature to have adopted separately and submitted separately each of the nine propositions in that amendment; but that fact has no force as an argument to prove that it could not be submitted as one amendment, if, in the discretion of the legislature, it saw fit to submit it in that way. The general purpose and object of the amendment was to restrict the power of the legislature in the matter of enacting special and private laws; and in that view of the case it was a single amendment, and could properly be submitted as such under the Constitution, or as several amendments, as the legislature should determine."

We are of the opinion that the amendment providing that the judges of the circuit and chancery courts shall be elected by the people in a manner and at a time to be provided by the legislature and the judges shall hold their office for the term of four years was properly submitted, and, as it received the requisite number of votes and has been inserted in the Constitution, it only re-

580    STATE ex rel. COLLINS v. JONES.    [Sup. Ct.

Opinion of the court.    [106 Miss.

mains for the legislature of the state by proper action to put the same into full force and operation.

This brings us to the consideration of the effect of the action of the legislature of 1912 in undertaking to put section 153 of the Constitution into active operation. At that session of the legislature a concurrent resolution was passed by both houses, reciting the previous submission of the proposed constitutional amendment, the fact that it had received the requisite number of votes, and providing "that said amendment be and is hereby inserted in the Constitution of the state of Mississippi as a part of said Constitution." At the same session both houses of the legislature passed what is known as Senate Bill No. 322, which is as follows:

### Senate Bill No. 322.

"An act to provide for the election of judges of the circuit courts and chancery courts, and to fix their terms of office.

"Be it enacted by the legislature of the state of Mississippi:

"Sec. 1. That on Tuesday after the first Monday in November A. D. 1912, and every four years thereafter— and concurrently with the election of representatives in Congress—there shall be held an election in every county for judges of the several circuit court and chancery court districts.

"Sec. 2. That nominations of candidates for the office of circuit court judges and chancery court judges shall be made in every county by primary elections to be held concurrently with the primary election to be held for the nomination of representatives in Congress in 1912 and every four years thereafter.

"Sec. 3. That said circuit court and chancery court judges shall take office on the first Monday in January, 1913, and shall hold the same for a term of four years, or until their successors shall have been duly elected and

qualified.   The terms of all circuit judges and chancel-
lors holding office now, or that may be holding office on or
before the first Monday of January, 1913, shall cease on
said date, and the salaries of all such judges and chan-
cellors shall cease at such date, unless their successors
shall have failed to be elected and qualified.

"Sec. 4.   That in case of death, resignation, or vacancy
from any cause in the office of judge of any circuit or
chancery court district, the governor shall issue his proc-
lamation calling a special election to be held sixty days
from the date of said proclamation in the circuit court
or chancery court district wherein such vacancy shall
have occurred, and the person elected to fill such vacancy
shall hold office until his successor shall have been elected
in the next succeeding election for circuit court judges
and chancellors, and shall have duly qualified.   And
pending the holding of said special election, the gov-
ernor shall make an emergency appointment, to fill the
vacancy until the same shall be filled by election as afore-
said.

"Sec. 5.   The qualifications and salary of circuit court
and chancery court judges shall remain the same as now
provided by law.

"Sec. 6.   That all laws and parts of laws in conflict
with this act are hereby repealed, and that this act take
effect and be in force from and after its passage."

This bill was submitted to the governor for his ap-
proval, and he vetoed the same, and thus the matter stood
when this suit was instituted to test the legal *status* of
the amendment, and incidentally the right of the appellee
to hold the office to which he was appointed after the
amendment was ratified by the people.   It is insisted by
the attorneys for the state that the veto of the bill by the
governor was a mere nullity, and that the amendment
went into effect as the result of the concurrent resolution
passed by the legislature.   The exact relation which the
governor sustains to the submission and adoption of pro-

posed constitutional amendments has been the occasion
of considerable controversy; and also of considerable lit-
igation in which the decisions of the courts are not very
helpful here because of the peculiarity of the questions
presented growing out of the laws passed upon in each
individual case. However, we do not think there is very
much difficulty in determining the question presented in
the instant case, for the reason that the people had the
right and the power to name the conditions upon which
the judges of the circuit and chancery courts of this state
should be elected, and they saw fit to provide in the
amendment itself that this should be done ''in a manner
and at a time to be provided by the legislature.''

It seems clear to us that this proposed amendment was
never expected to be self-executing, or to become opera-
tive upon any other conditions than those named in the
amendment and quoted above. This being true, it be-
comes necessary to determine how the legislature is to
provide the manner and the time for the election of these
judges, and the answer seems to be perfectly clear that
it must be done by legislation.

Section 72 of the Constitution provides, among other
things, that ''every bill which shall pass both houses
shall be presented to the governor of the state. If he
approve, he shall sign it, but if he does not approve, he
shall return it, with his objections, to the house in which
it originated, which shall enter the objections at large
upon its journal, and proceed to reconsider it.''

We cannot conceive that the term ''legislature,''
used in the amendment, referred simply to the senate
and not the house of representatives, as the attorney-gen-
eral insists, and that they, without the consent of the gov-
ernor, could enact such legislation as was embraced in
Senate Bill 322, and thus put the amendment into effect
over his veto except by the further action of the ma-
jority provided for by the Constitution. The legislature
which submitted the proposed amendment and the people

who voted for it must be presumed to have understood exactly what was meant by the submission and adoption of the amendment upon the conditions named therein, and these conditions are perfectly consistent with the importance of the change proposed by the amendment.

The change from an appointive to an elective judiciary was known to be fraught with possibilities of evil, such as the election of judges at a popular election, which could be largely minimized by legislative safeguards. It is a matter of current history and common knowledge that various methods of selecting judges are in vogue in the various states where an elective judiciary exists, and it was the manifest purpose of the legislature which submitted this proposed amendment, and of the people who voted for it and adopted it, that the legislature should adopt an elective judiciary scheme to put the amendment into operation, and this is what was meant by placing in the amendment itself the condition that the judges were to be elected ''in a manner and at a time to be provided by the legislature.'' This involves legislation pure and simple, just such as is ordinarily required in dealing with serious matters of state, that is to say, such as the mature consideration of the senate, the house of representatives, and governor combined.

The attorney-general argues that ''the amendment does not contemplate the action of the legislature plus the governor,'' and that the word ''legislature,'' found in the amendment, refers simply to the senate and house of representatives. We do not concur in this view. The terms ''legislature,'' found in the amendment, was used in its ordinary and popular sense, and contemplated the whole legislative machinery being brought into operation in providing a plan for putting this important change in our organic law into operation. The words ''in a manner and at a time to be provided by the legislature'' were used just as if they had been written ''in a manner and at a time to be provided by law.'' Various sections of

the Constitution use the word "legislature" when referring to legislative action, and provide that the legislature shall do the thing prescribed therein when it is perfectly certain that to do so requires the governor's approval.

As pointed out by counsel for appellee:

"In section 103 of the Constitution it is said: 'The legislature shall provide suitable compensation for all officers and shall define their respective powers.'

"In section 105 it is said: 'The legislature shall provide for the enumeration of the . . . inhabitants,' etc.

"In section 112 it is said: 'The legislature may . . . impose a *per capita* tax upon domestic animals,' etc.

"In section 152 it is said: 'The legislature shall divide the state into convenient court districts,' etc.

"In section 172 it is said: 'The legislature shall, . . . establish . . . inferior courts.'

"In section 178: 'The legislature shall have power to alter, amend, and repeal charters.'

"In section 182: 'The legislature' shall have the power to 'grant exemptions from taxation,' etc.

"On the other hand, in section 78 it is said that it shall be the duty of the legislature to regulate by law the cases in which deductions from salaries shall be made, etc.

"In section 79: 'The legislature shall provide by law for the sale of delinquent taxes.'

"Section 17: 'Private property shall not be taken . . . except' as 'provided by law.'

"In section 110: 'The legislature may provide, by general law, for condemning rights,' etc.

"In section 163: 'The legislature shall provide by law for the due certification of all causes,' etc."

This brings us to the consideration of the effect that the adoption of section 153, as amended, has upon section 177 of the Constitution. Section 177 as it stood in the Constitution prior to the adoption of the amendment

gave the governor the power to ''fill any vacancy which may happen during the recess of the senate in the office of judge or chancellor by making a temporary appointment of an incumbent.'' This was a supplement to section 153 of the Constitution, giving the governor power to appoint judges of the circuit and chancery courts, with the advice and consent of the senate, and the two together provided a complete scheme for an appointive system of the judiciary of the state. If section 153 had been repealed outright, taking from the governor all power of appointment of the judiciary, and giving the people the power to select the judges by election, it will not be doubted that such a repeal would also have operated as a repeal of section 177. The amendment of section 153 taking from the governor the power of appointment must necessarily have the same effect unless, as contended by counsel for appellee, both section 153 of the Constitution as amended and section 177 thereof can coexist in the same Constitution.

They say: ''Only section 153 was amended. That section originally provided that the governor should appoint the judges by and with the advice and consent of the senate, and that they should hold their office for the term of four years. That section, which was amended, provided, at the time this appointment was made, that it should be made when the senate was in session. Section 177, which is not amended, tells how the vacancies are to be filled. This section provides that the governor shall have the power to fill any vacancy which might happen 'during the recess of the senate in the office of judge or chancellor.' This section is unamended and not in conflict with section 153. The one is dealing with vacancies which occur during the recess of the senate; the other is dealing with the appointment for the full term, when the advisory body is in session. Both can stand; neither conflicts with the other; both have an independent purpose; and both harmonize. Therefore we

say that under the hasty amendment, if it be held that it was properly submitted, the only time when the election can be held, even under the amendment, in order to elect any judge would be when the vacancy occurs while the senate was in session. In other words, the power to fill vacancies during the recess of the senate is not dealt with at all; nor is it in conflict with the section amended; it remains as it did before the amendment was submitted, and all vacancies which happen during the recess of the senate, may be appointed by the governor, even if the amendment carried.''

When we remember that the senate only meets once in two years, and then only for a limited time, this construction of the effect of section 153 of the Constitution as amended leads to the following absurd result: That if the people can only elect the judges to fill ''vacancies which occur while the senate is in session,'' and the governor should continue, under section 177, to appoint the judges to fill all vacancies which occur during the recess of the senate, we would have an elective judiciary in name only, and an appointment judiciary in fact. Such construction is simply impossible.

With section 177 eliminated, and in the absence of a statute providing for a method of filling vacancies in the office of judge or chancellor, it devolves on the governor, when such a vacancy occurs, to make a provisional appointment under section 163 of the Constitution, to continue until the vacancy is regularly filled.

Appellee's appointment was a valid exercise of the power existing in the governor, and he will hold his office until the ''vacancy is regularly filled'' in accordance with such law as may be properly enacted to put section 153 of the Constitution as amended into active operation. That the result of this decision involves a change of the method of selecting the state's judiciary which has long been the pride of its citizens, and may incidentally result in shortening the term of office of the

appellee who has magnified the office filled by him, by the ability which he has brought to the discharge .of its duties, has not escaped the attention of the court, but they cannot be allowed to enter into the consideration of the question here involved, and we cannot bring ourselves to the belief that section 273 of the Constitution, the face meaning of which seems to be plain, should be so construed as to hobble the people and become a stumbling block in their path when they seek to amend the instrument so as to make the same conform to their will.

It has been suggested that the decision of the exact question herein raised, viz., the right of appellee to hold the office to which he was appointed, did not necessarily call for the decision of the constitutional questions herein reviewed and decided, and that it has been the rule of this court not to undertake to decide constitutional questions not necessarily involved in the decision of the case in hand. It is perfectly apparent from the pleadings in the case that the real purpose for which the suit was brought was to test the question of whether section 153 of the Constitution as amended had become a part of the organic law of the state, and that the fact that appellee held office by virtue of an appointment made by the governor, after that section had been inserted as a part of the Constitution, furnished an opportunity for the suit to test the real question involved by a trial of his right to hold the office to which he had been so appointed, and his right to office is really a mere incident to the real purpose of the litigation, though the real character of the tenure by which he holds necessarily involves all the questions here reviewed.

It is also worthy of notice that it appears from the petition that the legislature of the state requested the attorney-general to institute a suit to bring to the attention of this court for final adjudication the vexing question with which it was confronted, in order to determine whether section 153 of the Constitution as amended had

become a part of the Constitution of the state, and, if so, what further action, if any, was necessary to be taken by the legislative branch of the government to put the amendment, if properly adopted, into operation. We think this action on the part of the legislative branch of the government should meet with the respectful and careful attention of this court, and, in view of the fact that the question whether section 153 of the Constitution as amended is now a part of the organic law of the state has been fully raised by the pleadings in the case and ably argued on both sides, and as we think, is necessarily involved in determining the real character of appellee's tenure to office, we have undertaken to give to the case that attention which its importance demands, and thus meet the obligation of this court, which alone has the power, under our Constitution, to settle the questions presented.

It follows from the views hereinbefore expressed that appellee rightfully holds the office of chancellor, and the judgment of the court below is affirmed.

*Affirmed.*

Cook, J., dissenting.

Fourteen years ago this court, by unanimous decision, condemned the precise amendment we are now considering. To-day a divided court, grown wiser or more progressive, can find no flaw in the same amendment. We know what the law was yesterday, but our knowledge of yesterday is ignorance to-day. When to-morrow dawns, what the Constitution will be made to mean, by judicial construction, the prescience of Divinity alone can conjecture. If apologies were necessary, it seems to me that the above statement furnishes ample apology for this dissent.

The present amendment is decided to be a part of the Constitution, and we are confronted with complications, the solution of which is fraught with many difficulties. The court, as now constituted, may work out the problem

as far as it affects the judge whose title is challenged in the instant case, because, and because only, whether the solution be right or wrong, the solution will stand as the law of the case. What force the decision of my associates may have upon the rights of judges, whose terms of office extend beyond future elections, is for the future to determine, and, if this decision stands, judicial legislation may save the situation; nothing else can.

This is a very simple lawsuit, and the settlement of the rights of the parties thereto is not a complex problem. The attorney-general challenges the right of appellant to hold the office of judge of the chancery court, and it is wholly unnecessary to construe section 273 of the Constitution in order to decide this question. It is immaterial whether this section of the organic law has been amended or not. There can be no room for doubt that the trial court correctly decided this issue by dismissing the proceeding instituted by the attorney-general. No other judgment could have been rendered, and the amendment in question can in no way affect the judge whose title to the office is attacked. It is unnecessary to cite authorities to show that courts will not undertake to decide constitutional questions unless it is necessary to do so in order to adjust the rights of the parties to the litigation, or unless there is some other compelling reason for a construction of the Constitution. This is obviously the law, and this is the rule followed by all the courts.

In this state of the record my associates have undertaken to lay down rules for the determination of future lawsuits—controversies yet unborn. This is a courageous thing to do, an unnecessary labor of love, and a dangerous precedent, especially when, as in this instance, a fourteen year old and heretofore unchallenged decision of this court is to be repudiated because it is held to be unreasonable, unreasoning, and pernicious. I submit that an effort to provide a rule of construction for the

future guidance of the people is hazardous in the extreme, and, in my judgment, is entirely futile. According to my associates, a construction of the Constitution is never settled until it is settled right, and that the right is to be determined by the majority of the court last to pass on the question. It must be very consoling for a judge to be able to say that he knows that he is absolutely right, in spite of the contrary views of three other judges who are just as able and sincere as himself, but, I submit, this frame of mind will destroy all precedent, and substitute therefor the unbridled license of pride of opinion. This will bring about uncertainty, confusion, and frequent injustice.

I will not pause to make a differentiation between the doctrine of *res adjudicata* and *stare decisis;* the distinction being known to all lawyers. I claim, however, that the Powell case comes as near being *res adjudicata* of the instant case as is possible, without being so in the precise and technical sense. The parties to the Powell case were the state of Mississippi and a judge of the circuit court, who happened to be at the time Robert Powell; the parties here are the state and a judge of the chancery court, who happens to be the appellee. The decision of this court in the Powell case gave the office to Judge Powell, because the alleged amendment to the Constitution was not framed in the form the Constitution prescribed. The amendment in this case is exactly the same that failed to oust Powell; but by the majority opinion it is made effectual to oust Jones. Had this question arisen soon after the decision of the Powell case, and had my learned associates composed the majority then, we would have had in Mississippi the unique spectacle of Powell holding by appointment, because the elective principle was by one court declared to be nonexistent, while Jones would have been ousted from office by another court because his appointment was vacated by the adoption of the elective system. Powell could not be ousted by

any proceeding known to the law; he was securely en-
trenched behind the unscalable walls of *res adjudicata.*
Jones could not appeal to the decision in Powell's case to
save his office; *stare decisis* being dead, Jones would
have been forced to walk out. By the authority of the
Powell case, all of the judges appointed since have ex-
ercised their judicial functions, and have taken from and
given to litigants property of untold value, and have pro-
nounced death sentence upon a large number of unfortu-
nates, and it now comes to pass that these judges were
without authority, except as *de facto* officers.

I am not unmindful of the fact that the Powell case de-
cided the amendment had not received the majority of the
votes cast, but the illustration given above does not lose
any of its force because of that fact. Taking into con-
sideration possible complications of the sort mentioned,
together with the myriad of evils which attend a vacil-
lating policy of constitutional construction, the convic-
tion is forced upon me that the reasons given for the
slaughter of the doctrine of *stare decisis* are compara-
tively and essentially weak. The decision of my asso-
ciates does not possess the elements of stability and fix-
edness, because in its every fiber it carries a taint of
autoinfection, the *virus* of which is calculated to destroy
the decision as a precedent. Judges of different views
can always find in that decision authority to ignore prec-
edent, and for whittling away the time-tried doctrine of
*stare decisis,* whenever this principle of law stands in
the way.

"There is not in the common law, a maxim more emi-
nently just and promotive of the public convenience,
than that of '*stare decisis.*' . . . If law, well estab-
lished may be annulled by an opinion, a foundation is
laid for the most restless instability. The decisions of
one court may be overruled by another court; and those
of the latter will have only a transient efficacy, until some
future court, dissatisfied with them, shall substitute new

principles in their place. No system of inflexible adherence to established law can be as pernicious as such ceaseless and interminable fluctuations." *Palmer's Adm'rs v. Mead,* 7 Conn. 149.

To put it mildly, I believe it may be said, without the least exaggeration, that the judges composing this court when the Powell case was decided were lawyers of more than average ability, and that opinions rendered by them bear evidence of careful and thoughtful consideration of all questions presented to the court. The spokesman for the court in the Powell case enjoyed, and still enjoys, the distinction of being pre-eminently endowed with the power of exact and analytical reasoning, and the opinion prepared by him in that case, and approved by his associates, show that he frankly met and judicially dissected the cases mainly relied on by my associates to support their views in the present case. The Powell case had the best thought of three great judges, and those three judges reached a conclusion directly opposed to the views of my associates in the present case. It would seem that this fact alone would be a sufficient reason why we should adhere to the construction of the organic law of the state adopted in the Powell case. To the strength of the decision in the Powell case may be added the further fact that for fourteen years the construction placed upon the Constitution in that case has remained unchallenged, and no effort has been made to amend the Constitution so as to modify or change the rule of construction then announced.

We must presume that the representatives of the people, and the people themselves, are not dissatisfied with the Powell case, but, on the contrary, that they approve the same; and we must go further to ascertain why the legislature submitted the amendment in its present form. I think I may with propriety take judicial knowledge of the political history of the state and therein find a possible solution of the puzzle. Political issues in this state

are few, and the people are necessarily a unit on almost everything, and to give some spice to the campaigns candidates for public offices have used an elective judiciary for the purpose of relieving the monotony of each campaign. It is certain, however, that no amendment to the Constitution whereby the rule of construction adopted in the Powell case might be changed has been proposed or discussed. The elective judiciary issue must, however, be preserved in some form for future exploitation, and the least harmful way to attain this end has been to submit an amendment to the Constitution which would be guaranteed not to put that question at rest. However, having served in the legislative department of the government, and being now unable to even conjecture what reasons controlled me in many of the votes cast by me, I am fully conscious of the futility of any effort to peer into the legislative mind, and I have about come to the conclusion that it is quite as difficult to forecast the workings of the judicial mind. But whatever may have been the motive of the legislature when this question was submitted in a form condemned by the supreme court as abortive to accomplish the election of the judges of the chancery court and judges of the circuit court, it remains sure that the legislature adopted the surest plan to defeat the election of these judges, unless this court should waver and recant, which contingency, I submit, was not reasonably to be anticipated.

In presenting my views, I have thus far proceeded upon the theory that the rule of construction announced by my associates is a better rule of construction than was announced in the Powell case, while, as a matter of fact, I am not prepared to concede that theory. My own opinion of this controverted point is that this court adopted a reasonable rule in the Powell case—not the only reasonable rule, but simply a reasonable rule. I am not called upon to say what rule I would choose if the rule to be adopted was an original question, but I have no doubt of the rule we should adopt in this case.

106 Miss. 38

Again, I submit that there is no reason why the courts of one state should permit the courts of other states to construe their Constitution for them. The court of this state is much better qualified to interpret the will of our people than are the courts of South Dakota, Colorado, or Wisconsin. The nation itself has always been divided into two great schools of thought in the construction of the powers of Congress under the Constitution. Mississippi has always lined up with the strict constructionists, while the dominant thought of the states just mentioned is probably on the side of the liberals. Must we slavishly follow the lead and adopt as inspiration the views of our neighbors, when their problems and their ideals are entirely different from and out of harmony with our own?

In our anticommercial statutes we have adopted a policy entirely different from that in any other state. Our "Jim Crow" laws would receive a cold reception in the states mentioned. In the emancipation of women from the rigors of the common law in regard to the ownership of property, we did not wait for Wisconsin, Colorado, and South Dakota to lead the way. In fact, we have generally led and seldom trailed.

I believe no case can be found in the entire history of American jurisprudence where in a succeeding court has overruled the decision of its predecessors in a case like this, and that the opinion of my associates in the present case stands in a class created by itself. The enormous number of cases cited by my associates may appear impressive, but, as they do not touch the question here involved, the impressiveness of numbers is not at all convincing. The industry displayed by my learned associates in searching the authorities in a vain effort to find a case which can be construed to justify the overruling of a principle of constitutional construction that has been the fixed rule of law for fourteen years is commendable, but I submit that their industry and ability

has been unavailing in the present case. When they nevertheless stand to their guns, admiration for their unflagging industry yields to astonishment at their temerity.

I have carefully reviewed the cases cited in the opinion of the court, viz.: *Beck* v. *Allen,* 58 Miss. 143; *Lombard* v. *Lombard,* 57 Miss. 177; *Garland* v. *Rowan,* 2 Smedes & M. 631. These cases are relied on to justify a refusal to stand by the doctrine of *stare decisis.* I have been unable to perceive in what way these cases give any comfort to my associates.

My brethren have assumed that the amendment construed in the Powell case "was very much more complex and complicated than the amendment proposed in the instant case." I confidently submit that this assumption is unsound by whatever rule the comparative complexity of the two amendments may be measured. Did the legislature pass the amendment? Tested by any rule, I confidently assert that the legislature has never passed an amendment. They did exactly what the resolution under review says they did, and nothing more. There is no room for construction to be found in the resolution. The Constitution commands the legislature to pass a resolution amending the Constitution if they deem an amendment necessary, and when the legislature has passed such resolution their powers are exhausted. The legislature is not empowered to submit to the people an amendment; the Constitution imposes this duty upon the secretary of state.

There is not a word or syllable in the entire resolution that justifies the presumption that the legislature sought to amend the Constitution, but, on the contrary, the resolution plainly and undisguisedly shifts this responsibility to the broad shoulders of the people. All that part of the resolution providing for its submission is *brutum fulmen,* but it does demonstrate exactly what the legislature intended to do, viz., to submit, not to pass, an amendment.

596        STATE ex rel. COLLINS v. JONES.        [Sup. Ct.

Opinion of the court.        [106 Miss.

No lawyer, however resourceful he may be, can answer this contention, except by resorting to the contemporaneous construction idea, a pure legal fiction as unsubstantial in its application to this case as the fabric of a dream. No intention can be imputed to the legislature different from what the resolution plainly sets forth. They did submit an amendment to the people; they did not pass a resolution amending the Constitution.

My associates do not balk at overruling a solemn decision of this court, nor do they hesitate to repeal the Constitution by giving contemporaneous construction the force of an amendment to the Constitution. A mere reading of section 253 will demonstrate that the legislature must pass an amendment to the Constitution; the amendment must be voted for by two-thirds of each house. This must affirmatively appear. The resolution in the present case does not pretend that the members of the legislature voted to amend the Constitution.

The resolution states that the members voted to submit an amendment to the people. There is nothing to construe; the language of the resolution is plain and unambiguous. It is well known that members will vote for referring things to the people, when they are uncompromisingly opposed to the proposition referred. This question has never been raised until it was raised in this case, and I earnestly insist that the contention of appellee is unanswerable, unless it can be said that contemporaneous construction has infinitely more force than a decision of the supreme court.

In order to maintain this amendment it is not only necessary to overrule the Powell case. It is also necessary to give more weight to the contemporaneous construction idea than is given to the solemn decision of the highest court of the state. My associates are driven into a *cul de sac*, and, to find a way out, contemporaneous construction is clothed with the force and power of an amendment to the Constitution. In my opinion, nothing

could more forcibly illustrate the unwisdom of straying from the beaten path to promulgate a new rule of construction which may, or may not, be a better rule than the old rule.

All of the cases cited by my associates seem to give great weight to the fact that the people had voted for the amendments before them. It seems to be the contention that the people's vote cures all defects and omissions of the legislature. This does not seem good nonsense to me. The people have limited themselves in their own Constitution, and the courts have no power to loosen the self-imposed limitations. Besides, the people have commanded their representatives not to bother them with voting on amendments, unless the representatives believe them necessary, and the Constitution points out the way for the representatives to manifest their belief that the proposed amendment is necessary. Something is said about the people's having indorsed the amendment we are considering. By a pure fiction of the law this is true, and it would also be true had only five votes been cast, three of which were cast for the amendment. Less than twenty thousand voters are no more the people than the three tailors of London, who issued their decree styling themselves: "We, the people of England." The people are presumed to know the law, and by this legal fiction I am authorized to say that the voters did not vote on this amendment because they knew the supreme court had said that it was void. As a matter of fact, this court has no mandate of the people to spur them to an extraordinary effort to destroy the wholesome doctrine of *stare decisis,* and all talk about the people's will, clearly expressed, sounds well, but has no foundation of fact.

In the celebrated case of *Shylock* v. *Antonio,* Bassanio makes a powerful appeal to the judge to depart from the fixed rules and find a rule to fit the special case. I quote the appeal and the reply of the wise and just judge, viz.:

*Bassanio*:                         "And I beseech you,
        Wrest once the law to your authority:
        To do a great right, do a little wrong,
        And curb this cruel devil of his will."
*Portia*:
        "It must not be; there is no power in Venice
        Can alter a decree established:
        'Twill be recorded for a precedent,
        And many an error, by the same example,
        Will rush into the state: it cannot be."

I believe it is generally admitted that justice was meted out in that case by a strict adherence to the law as it was written, and I submit the same result will follow in a large majority of cases by the application of the same principle.

In conclusion, I venture to suggest to my associates a careful and thoughtful consideration of the Golden Text of the International Sunday School Lessons for yesterday, which reads thus: "Look therefore whether the light that is in thee be not darkness." Luke xi, 35.